UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEBORAH M. BAKER,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    No.  4:05CV2253 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,[1]               )
                                     )
                Defendant.           )

**MEMORANDUM AND ORDER**

        This cause is before the Court for a second time on
plaintiff's appeal of an adverse ruling by the Social Security
Administration.   All matters are pending before the undersigned
United States Magistrate Judge, with consent of the parties,
pursuant to 28 U.S.C. § 636(c).

**I.  Procedural Background**

        On January 13, 1998, plaintiff Deborah M. Baker filed an
application for Disability Insurance Benefits (Tr. 81-83) and
Supplemental Security Income (Tr. 43-44) pursuant to Titles II and
XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381
et seq.  In her applications for benefits, plaintiff claimed that
she became disabled and unable to work because of her disabling
condition on July 28, 1996.   On initial consideration and

---

[1]Michael J. Astrue became Commissioner of Social Security on
February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules
of Civil Procedure, Michael J. Astrue is substituted for former
Commissioner Jo Anne B. Barnhart as defendant in this cause.

reconsideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 46-56, 59-64, 67-71.) Upon request by the plaintiff, a hearing was held before an Administrative Law Judge (ALJ) on March 29, 1999. Plaintiff testified at the hearing and was represented by counsel. (Tr. 20-42.) On April 7, 1999, the ALJ issued a decision denying plaintiff's claims for benefits, specifically finding that plaintiff could perform her past relevant work. (Tr. 10-19.) On August 15, 2000, the Appeals Council denied plaintiff's request for review of the ALJ's adverse decision. (Tr. 4-6.) The ALJ's determination was thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

On September 21, 2000, plaintiff appealed the Commissioner's adverse decision to this Court, see Baker v. Halter, Cause No. 4:00CV1526 FRB (E.D. Mo. 2000) ("Baker I"), and raised the following arguments to support her request that the Commissioner's decision be reversed: 1) that the ALJ failed to give appropriate weight to plaintiff's subjective complaints, and 2) that the ALJ erred in not obtaining the testimony of a vocational expert. The Commissioner answered plaintiff's claims in his Brief in Support of the Answer. In a Memorandum and Order entered March 29, 2002, the Court found that the ALJ's adverse decision lacked any meaningful discussion of much of the evidence of record in relation to the factors required to be considered

under <u>Polaski v. Heckler</u>[2] in determining a claimant's credibility. Given this lack of discussion, the Court found that it could not be said that the ALJ's credibility determination was based on substantial evidence on the record as a whole. Accordingly, the cause was remanded to the Commissioner for re-evaluation of the record. (<u>See</u> <u>Baker I</u>, *Memo. and Order* at pp. 27-36.) The Court determined not to review plaintiff's claim regarding vocational expert testimony inasmuch as such review would have been premature given the ALJ's finding that plaintiff could return to her past relevant work. (<u>Id.</u> at pp. 36-37.) Judgment was entered that same date reversing the Commissioner's decision and remanding the matter to the Commissioner for further proceedings. No appeal was taken by either party from this Court's Judgment.

Upon remand to the Commissioner, the Appeals Council vacated the previous decision of the Commissioner and remanded the matter to an ALJ to conduct further proceedings consistent with the Court's Memorandum and Order in <u>Baker I</u>. (Tr. 389-90.) Thereafter, a subsequent hearing was held before an ALJ on April 10, 2003, at which plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. (Tr. 335-78.) On May 19, 2003, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 322-34.) On October 4,

---

[2]739 F.2d 1320 (8th Cir. 1984).

2005, upon consideration of some additional evidence,[3] the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 315-18.) The ALJ's adverse decision of May 19, 2003, thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g). Plaintiff now seeks judicial review of this second adverse decision.

## II. Administrative Hearing Before the ALJ Upon Remand

A. <u>Plaintiff's Testimony</u>

At the hearing on April 10, 2003, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was thirty-six years of age. (Tr. 338.) Plaintiff stands five-feet, six inches tall and weighs 117 pounds. Plaintiff is right-handed. (Tr. 340.) Plaintiff is married and has an eight-year-old son. Plaintiff completed high school. In 1986, plaintiff received a one-year certificate in data entry. (Tr. 339.)

Plaintiff testified that for approximately seven years, she worked as a medical aide/receptionist in medical offices using her data entry skills. (Tr. 339.) Plaintiff testified that she stopped working in July 1994 after her maternity leave had expired. Plaintiff testified that she was experiencing back pain at that time and wanted to spend more time at home with her newborn son.

---

[3]Plaintiff submitted additional medical records to the Appeals Council for review. The Appeals Council retained only some of these records for consideration and returned the other unreviewed records to plaintiff. (Tr. 315.)

(Tr. 358-59.)  Plaintiff testified that she has not updated her skills or been retrained since that time.  (Tr. 339.)  Plaintiff testified that in 1990 and 1991, she also performed general secretarial duties but left such employment because she was moving to another state.  (Tr. 359.)  Prior to such work, plaintiff testified that she "worked normal teenage jobs[.]"  (Tr. 340.)  Plaintiff testified that she could not perform her previous work because of the pain she experiences, her inability to sit still for a long time, and that her employment would probably be terminated because she would miss too many days of work.  (Tr. 350-51, 359.)

Plaintiff testified that she broke her pelvis in an automobile accident in 1986.  (Tr. 346, 361.)  Plaintiff testified that she also injured her back and neck in the accident.  Plaintiff testified that she also had fibroids, polyps, cysts, two or three D & C's, an ovary removed, two miscarriages, kidney stones, and underwent leg surgery.  (Tr. 346.)

Plaintiff testified that she started experiencing pain in 1993 and 1994 and that the birth of her son in 1994 exacerbated the pain and "really brought the onset[.]"  (Tr. 340.)  Plaintiff testified that she began experiencing pain in her left leg in 1996.  (Tr. 363.)  Plaintiff testified that her back condition, herniated disc and degenerative disease cause her the most pain.  Plaintiff testified that she has a herniated disc at the L4-L5 level and that she underwent back surgery in 1997 to remove a disc to relieve compression.  Plaintiff testified that prior to surgery, she could

not feel her legs and toes and could not walk. (Tr. 341.)
Plaintiff testified that the back surgery did not resolve her pain
and that subsequent to surgery, certain activities, such as lifting
too much, standing or sitting a certain way for too long, caused
the nerve in her back to pinch which would exacerbate the pain.
(Tr. 360.) Plaintiff testified that she underwent two other back
procedures on an outpatient basis for the administration of nerve
blocks in attempts to relieve the pain not resolved by the previous
back surgery. (Tr. 341-42.) Plaintiff testified that the nerve
blocks actually worsened her pain for a period of four or five
days, and that the pain would then subside to its previous level.
(Tr. 342-43.)

Plaintiff testified that prior to 1994, she exercised,
did laundry, cleaned house, and rode her bicycle. (Tr. 361.)
Plaintiff testified that subsequent to her back surgery, she could
perform only basic household chores, such as making beds and
sorting laundry, but that she received assistance with
housecleaning. (Tr. 366-67.) Plaintiff testified that in addition
to her husband's help, she received help in caring for her son when
he was younger in that a woman would take him into her home three
days a week. (Tr. 351.) Plaintiff testified that she also
received help from her parents when they were around. (Tr. 352.)
Plaintiff testified that, during that time, she could sit or stand
for fifteen to twenty minutes before she needed to shift her
position on account of pain. (Tr. 367-68.) Plaintiff testified

that, during that time, she could lift and carry nothing heavier than a gallon of milk. Plaintiff testified that her back pain remained the same through 2000, but that she was able to regain feeling in her toes through rehabilitation. (Tr. 370.)

Plaintiff testified that her back pain now prevents her from lifting heavy loads of laundry and from engaging in certain types of bending or stooping for very long periods of time. Plaintiff testified that trying to do too much aggravates her pain. (Tr. 343.) On a scale of one-to-ten, plaintiff testified that her pain is mostly at a level seven or eight and is at a level five when she is feeling her best. (Tr. 344.) To relieve the pain, plaintiff testified that she has a heating pad attached to her chair "non-stop," that she takes a bath every night, and that she takes Ultram and over-the-counter pain medication. (Tr. 343-44.) Plaintiff testified that sitting straight against a support helps to "push the nerve back in place" and gives her greater comfort than slouching. (Tr. 344.) Plaintiff testified that her back pain radiates to her legs, arms, fingers, and neck. (Tr. 344-45.) Plaintiff testified that her fingers, left arm, the left side of her face, and the toes on her left foot go cold and numb. (Tr. 345.) Plaintiff testified that she did not experience such conditions prior to her back surgery. (Tr. 371.) Plaintiff testified that such conditions prevent her from moving her arm a certain way and cause her concern with cooking and doing the dishes given the coldness of her fingers. (Tr. 372.) Plaintiff testified

that she was diagnosed in 1999 as having bone spurs of the thoracic spine between the shoulders and that she believed such condition was the cause of the coldness in her neck, face, arm, and back. (Tr. 348.)

Plaintiff testified that she had seasonal allergy problems prior to 2000 and that she took over-the-counter medication for the condition. (Tr. 348-49.) Plaintiff testified that she also had certain female conditions before 2000 which were thought to be the cause of her back and hip pain. Plaintiff testified that she had multiple surgeries and finally a hysterectomy, but that it was ultimately determined that she had herniated discs. Plaintiff testified that her female conditions affected her ability to work only when she had to be off of work subsequent to the surgeries. (Tr. 347.)

Plaintiff testified that she also experienced urinary/ bladder problems prior to 2000 in that she would have to urinate ten or eleven times during the day and get up to urinate four or five times in the night. (Tr. 349-50.) Plaintiff testified that she was diagnosed with kidney stones and diverticulum of the bladder and underwent surgery on her left kidney in 2000. Plaintiff testified that her doctors continue to monitor her bladder condition. (Tr. 350.)

As to her daily activities, plaintiff testified that she has been unable to sweep and mop or lift heavy loads of laundry since her back surgery. Plaintiff testified that she uses a

dishwasher, but that standing long periods of time to do the dishes is difficult. (Tr. 353.) Plaintiff testified that she rests during the day and that the heating pad on her chair helps her back pain. (Tr. 353-54.) Plaintiff testified that she goes to bed around 9:00 p.m. Plaintiff testified that she wakes her son at 6:00 a.m. and that he catches the bus to school at 6:40 a.m. Plaintiff testified that she does not prepare daytime meals for her son because he eats at school. Plaintiff testified that she prepares dinner and mostly uses prepackaged foods such as macaroni and cheese and fish sticks. (Tr. 354.)

B. <u>Testimony of Vocational Expert</u>

James Israel, a vocational expert, testified at the hearing in response to questions posed by counsel and the ALJ. Mr. Israel testified that plaintiff's past work as a medical receptionist was at the light exertional level of work and that plaintiff has no transferable skills from such employment because of her time away from such work and the change in technology from the time she performed such work. (Tr. 373.)

The ALJ asked Mr. Israel to assume an individual of thirty years of age with post high school education and with plaintiff's work experience as indicated by the evidence. The ALJ asked Mr. Israel to assume that such an individual could lift ten pounds; could stand and walk for a total of not more than two hours in an eight-hour work day with regular breaks; could sit for a total of six hours in a regular work day; and would need a sit/

9

stand option as needed between standing, walking and sitting. (Tr. 373-74.) The ALJ further asked Mr. Israel to assume that such a person could not climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could occasionally stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to vibration. (Tr. 374.) Mr. Israel testified that such an individual could not perform plaintiff's past relevant work. Mr. Israel testified that such an individual could perform other work, however, such as cashier, of which 3,500 such jobs existed in the State of Missouri in 2002; general office clerk, of which 2,500 such jobs existed in the State of Missouri in 2002; order clerk, of which 1,000 such jobs existed in the State of Missouri in 2002; and sales counter clerk, of which 3,500 existed in the State of Missouri in 2002. (Tr. 375.)

The ALJ then asked Mr. Israel to assume that the sit/stand option for the individual must include the ability for the individual to sit for a period of fifteen to twenty minutes, then stand for fifteen to twenty minutes, return to sitting for fifteen to twenty minutes, etc., instead of merely standing to stretch and then return to sitting. (Tr. 375-76.) Mr. Israel testified that such a person would be unable to sustain employment. (Tr. 376.)

### III.  Medical Records[4]

On June 1, 1995, plaintiff was admitted to Lake Forest Hospital for a diagnostic hysteroscopy and D&C (dilation and curettage) in response to plaintiff's complaints of dysfunctional bleeding.  Dr. Michael J. Hubbell noted plaintiff to have tolerated the procedure well and experienced no complications.  Plaintiff was discharged that same date.[5]  (Tr. 179-83.)

On May 24, 1996, plaintiff was again admitted to Lake Forest Hospital for a total abdominal hysterectomy and bilateral salpingo-oophorectomy.  Hospital records indicate that plaintiff had experienced chronic pelvic pain and chronic dysfunctional uterine bleeding that was unresponsive to various hormonal and surgical regimens.  Dr. Hubbell noted there to be no complications and that plaintiff tolerated the procedure well.  Plaintiff was discharged from the hospital on May 26, 1996.  (Tr. 170-77.)

---

[4]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council.  This evidence consists of treatment notes dated November 9, 2002; and Missouri Baptist Hospital treatment notes and reports from February 12, 1998, through June 27, 2001.  (Tr. 434-54.)  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

[5]The doctor performing the procedure, Dr. Michael J. Hubbell, did not provide medical records when requested by the Social Security Administration.  A letter from Dr. Hubbell dated January 29, 1998, stated:  "I have no opinion regarding Deborah Baker's claim of disability.  I suggest you contact her orthopedic physician, Dr. Rowley (sp?) regarding this claim."  (Tr. 260.)

On July 25, 1996, plaintiff saw Dr. Richard Kortan, a chiropractor, for complaints of hip pain. Dr. Kortan diagnosed the plaintiff with left sacral ileitis, lumbar neuritis and lumbalgia. From July 25 through August 9, 1996, plaintiff visited Dr. Kortan on five occasions during which Dr. Kortan applied traction, manipulation, and electrical stimulation plus moist heat to the lumbar spine with mild improvement noted. Dr. Kortan recommended that plaintiff undergo orthopedic consultation. (Tr. 189-91.)

On August 12, 1996, plaintiff visited Dr. Bruce Hamming on referral for an orthopedic evaluation. (Tr. 196.) Plaintiff complained of pain and of a mass in her left buttock region that she had noticed approximately eight months prior. Plaintiff reported the mass to become larger with activity and to shrink with inactivity. Dr. Hamming noted a soft tissue bulge in the upper sacroiliac region of the left buttock and opined that it was most likely a benign mass, but could be a cyst from the sacroiliac joint. Dr. Hamming recommended that plaintiff have an MRI of the area to define the mass and its characteristics and to determine whether surgery was needed. (Tr. 195.) An MRI of the hip and buttock region taken on August 16, 1996, was essentially unremarkable. (Tr. 274.)

Plaintiff returned to Dr. Hamming on September 16, 1996, and reported no improvement in her symptoms. On September 17, 1996, Dr. Hamming noted a small mole close to where plaintiff felt swelling and discomfort. Dr. Hamming discussed treatment options

and the negative MRI with plaintiff and recommended that she return in one month for a recheck. (Tr. 194.)

Plaintiff returned to Dr. Hamming on November 19, 1996, and reported that Daypro[6] had helped her condition but that she continued to have deep burning pain in the buttock region, sometimes radiating to the thigh. Plaintiff reported the pain to be worse with sitting rather than with being up and moving around. Dr. Hamming noted plaintiff to have no back pain. Plaintiff could forward flex and touch her fingers to the floor. Dr. Hamming observed the pain not to appear directly related to the hip joints or to the sacroiliac joint. Dr. Hamming opined that there could be nerve irritation in the lower back or in relation to plaintiff's prior abdominal surgery. Dr. Hamming recommended that plaintiff see a neurologist. (Tr. 194.)

On December 3, 1996, plaintiff visited Dr. Wilbur F. Rowley, a neurologist. Plaintiff reported to Dr. Rowley that she broke her pelvis in a motor vehicle accident in 1992 and that she healed "nicely" from that injury and subsequently underwent pelvic surgery in 1992 for the removal of ovarian cysts. (Tr. 201.) Plaintiff reported to Dr. Rowley that she underwent a hysterectomy in 1996 and complained that, since that time, she has experienced pain in the left gluteal hip sacroiliac region with occasional pain

---

[6]Daypro is indicated for acute and long-term use in the management of the signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference 2993 (55th ed. 2001).

spreading down into the hamstring area and into the left knee. Plaintiff also complained of an occasional numb, tingling sensation down the back of the left gluteal hamstring area. Dr. Rowley noted plaintiff to have had cortisone injections without benefit. Plaintiff reported no symptoms relevant to the right leg, neck or upper extremities. Review of systems was unremarkable. Neurologic examination showed plaintiff to have full range of motion of the neck. Straight leg raising was negative. No percussion pain was noted about the lumbosacral spine. Pedal pulses were noted to be intact. Motor examination was normal. Heel, toe and tandem walking was noted to be normal. Plaintiff could hop without difficulty and could reach down and touch her fingertips to the floor. Dr. Rowley recommended a CT scan of the abdomen and pelvis to rule out any problems in the retroperitoneal space, particularly on the left; an MRI of the lumbosacral spine to rule out any disk disease or cysts; plain films of the lumbosacral spine; and electrodiagnostic studies of the low back and left lower extremity. (Tr. 201-04.)

On January 7, 1997, plaintiff underwent a CT scan of her abdomen and pelvis, which showed a cystic mass in the lower left pelvis which deviated the left colon and produced some pressure upon the left wall of the bladder. The reviewing physician, Dr. Adelaide Gomez, reported the mass to have a benign appearance but noted that cyst aspiration under CT or ultrasound guidance might be helpful for better evaluation. (Tr. 200.)

On January 8, 1997, plaintiff called Dr. Rowley's office requesting the name of an obstetrician/gynecologist. Dr. Rowley recommended that plaintiff call "Dr. Allen" to schedule an appointment for the next day and to advise him of her CT and MRI testing.[7] (Tr. 199.)

On January 8, 1997, plaintiff underwent an MRI of the lumbar spine which showed an L4-5 disc bulge and a small-to-moderate-sized left-sided disc extrusion at L5-S1. (Tr. 271.)

On January 9, 1997, Dr. Rowley noted that he received a call from Dr. Hubbell, plaintiff's treating obstetrician/gynecologist, who reported that plaintiff had called him and was very upset. Dr. Rowley reported to Dr. Hubbell that plaintiff had demanded to "see somebody else" and that he had given her the name of another gynecologist. (Tr. 198.)

In a letter dated January 9, 1997, Dr. Meneleo E. Avila informed Dr. Rowley of his findings made as a result of a neurosurgical consultation with plaintiff performed that same date. In the letter, Dr. Avila reported that plaintiff complained to him that she had experienced pain in her left lower quadrant and left low back since her hysterectomy in May 1996 and that her doctor advised her that the hysterectomy entailed lysis of adhesions in the left lower quadrant between the uterus, small intestine and colon. Plaintiff reported that after her pain persisted for over

_____

[7]Nothing in the record shows plaintiff to have ever visited a "Dr. Allen."

a week, Dr. Hubbell advised the plaintiff to see a chiropractor but that the chiropractic treatments did not relieve her pain. Plaintiff reported that she continued to have some vaginal bleeding which Dr. Hubbell told her was due to some "dog ears" which were cauterized in the area of the surgery. Plaintiff reported that she was referred to Dr. Hamming for orthopedic evaluation and that steroid injections administered by Dr. Hamming to the left sacral area provided no significant relief. Plaintiff also reported that she was prescribed Oruvail[8] and Daypro which also failed to give her significant relief. Plaintiff reported that a CT scan of her pelvis showed a pelvic mass and that she saw Dr. Spellman, an obstetrician, and was told there were no hard masses in the pelvis but that she was sore. Plaintiff reported that Dr. Spellman recommended an ultrasound evaluation.[9] (Tr. 208-11.)

During his consultation, Dr. Avila reviewed the MRI taken January 8, 1997, and noted it to show a herniated disc at L5-S1 with marked compression and enlargement of the left S1 root. Plaintiff currently complained of pain in her left low back and left iliac crest inguinal region down the left lower extremities with numbness and tingling in her left leg. Dr. Avila noted plaintiff to have constant pain and to have marked difficulty

_____

[8]Oruvail is indicated for the management of the signs and symptoms of rheumatoid arthritis and osteoarthritis. Physicians' Desk Reference 3411 (55th ed. 2001)

[9]The transcript contains no medical records from Dr. Spellman.

sitting in a chair.  Plaintiff could walk on her heels and on her toes.  An inequality of strength was noted with repeated toe standings on her left and right side.  Plaintiff rated her pain level to be an eight on a scale of one to ten.  Dr. Avila noted that upon sensory examination, plaintiff had numbness and tingling on her left leg and that the pinprick sensation seemed slightly lesser on the left lateral foot than on the right.  Dr. Avila reported that plaintiff's ankle reflexes were asymmetrical:  the right was 2+ and the left was absent.  Dr. Avila also noted that plaintiff's left gastrocnemius muscle was weak compared to the right and that the plaintiff could not sustain repeated toe stands on the left side.  Plaintiff's straight leg raising was positive for pain on the left side at thirty degrees of elevation.  Dr. Avila concluded that plaintiff had a left L5-S1 herniated disc with S1 radiculopathy.  He also concluded that she had residual pain in the left pelvis as a result of her hysterectomy in 1996.  Dr. Avila offered two treatment options: 1) lumbar epidural blocks for pain relief or 2) a lumbar microdiskectomy to remove the disc herniation.  Plaintiff determined to undergo the lumbar micro-diskectomy.  (Tr. 208-11.)

Plaintiff underwent a lumbar microdiskectomy on January 13, 1997.  Dr. Avila noted plaintiff to have tolerated the procedure well.  (Tr. 236-37.)

On February 10, 1997, plaintiff followed up with Dr. A. Rabin regarding the microdiskectomy.  Plaintiff complained of

continued pain in her lower back and left hip and of numbness and tingling in her legs. Upon examination, Dr. Rabin diagnosed plaintiff with status post microdiskectomy L5-S1, left S1 radiculopathy, and lower back pain. Dr. Rabin ordered physical therapy with concentration on range of motion of the thoracolumbar spine, with such therapy to include heat, electrical stimulation and an exercise program. (Tr. 228-29.) Thereafter, plaintiff underwent physical therapy at Saint Therese Medical Center approximately twice a week from February 14 to May 14, 1997. (Tr. 240-45.)

In a letter dated April 8, 1997, Dr. Avila updated Dr. Rowley as to plaintiff's condition since her January 1997 microdiskectomy. Dr. Avila reported that plaintiff had experienced an improvement in the amount of her pain in the left lower extremity and left low back and that he had referred her to Drs. Rabin and Nanda for rehabilitation of her back. It was noted that plaintiff reported that she attends rehabilitation three times a week but that she experienced more problems with pelvic pain on the left side which radiates to the back of her left sacrum into her left buttock, producing extreme pain radiating down her left leg. Plaintiff also reported experiencing pain down the right leg. Plaintiff further reported that she returned to her previous gynecologist, Dr. Hubbell, and had not continued to see Dr. Spellman. Plaintiff reported that Dr. Herbert Beck, a gynecological oncologist, told her that she had three peritoneal

18

cysts in the left pelvic area between the rectum and the sacrum with cyst leak.[10]  Plaintiff reported that she had never been diagnosed with endometriosis nor was ever told that there were endometrial cysts seeding in her peritoneum.  Dr. Avila opined that the presence of cysts in the peritoneum would cause the pain in plaintiff's legs of which she complained.  Upon examination, plaintiff reported continued pain in the left iliac crest and lower abdominal area and of continued numbness in the left lower extremities.  Plaintiff had no left ankle reflex.  Plaintiff was able to raise her left leg to eighty degrees which demonstrated improvement from the thirty-degree level previously observed. Plaintiff was able to walk well without any pain.  Dr. Avila concluded that plaintiff had fair results from the lumbar diskectomy with relief of a lot of the pain down her left lower extremity, and opined that "the residual pain she feels could be secondary to the pelvic component of her problem."  It was noted that plaintiff was in the process of selling her home and moving to St. Louis.  Dr. Avila thus recommended to plaintiff that she obtain a copy of the pathology report from her hysterectomy to take to St. Louis with her to rule out endometriosis.  Inasmuch as plaintiff was "doing a lot of moving in her home at the present time," Dr. Avila prescribed Tylenol #3 for pain and instructed plaintiff to

---

[10]The transcript contains no medical records from Dr. Beck.

take such medication sparingly.[11] (Tr. 206-07.)

On September 10, 1997, plaintiff underwent an MRI in response to her complaints of pain. The MRI showed a bulging/minor protruding disc at L4-5 which was mildly indenting the ventral thecal sac. Dr. Friedman reviewed plaintiff's previous MRI and noted the bulging disc to be either unchanged or minimally more prominent than in January 1997. Dr. Friedman also noted degenerative and postoperative changes at the L5-S1 which were related to plaintiff's January 1997 surgery. (Tr. 263-65.)

An ultrasound examination of plaintiff's abdomen and pelvis performed on September 22, 1997, upon the order of Dr. Hubbell, was normal with no evidence of masses. (Tr. 178.)

On October 13, 1997, Dr. Raghavender Thunga performed a caudal epidural steroid injection in response to plaintiff's complaints of pain which, Dr. Thunga noted, provided 100 percent relief. Dr. Thunga instructed plaintiff to return in two or three weeks for a repeat injection and also considered psychiatric treatment for plaintiff, such as prescribing Elavil. On October 21, 1997, plaintiff reported to Dr. Thunga that she felt better overall although she still had pain. Dr. Thunga noted that there were no complications from the procedure. (Tr. 238.) On November 10, 1997, plaintiff reported that she had pain for two to three

_____

[11]Tylenol #3 (Tylenol with codeine) is indicated for the relief of mild to moderately severe pain. Physicians' Desk Reference 2397 (55th ed. 2001).

days after the first procedure and then good relief for one to two weeks. With the second caudal epidural procedure performed on November 10, plaintiff stated she felt more relief than after the first procedure. (Tr. 239.)

On January 27, 1998, plaintiff visited Dr. A.B. Gross, a chiropractor, and reported experiencing pain and numbness in her left arm down to her outer three fingers. Physical examination showed a fifty percent loss of grip strength in plaintiff's left arm and an absence of the brachial reflex, biceps reflex and triceps reflex in the left arm. Dr. Gross noted tenderness in the mid-thoracic spine and some tenderness in the lower cervical spine. Dr. Gross referred plaintiff to Dr. Peeples. (Tr. 254-57.)

Plaintiff visited Dr. David M. Peeples, a neurologist, on February 2, 1998. Plaintiff complained of chronic low back pain, left leg pain and a three-month history of mid and upper back and neck pain with left upper extremity numbness. Plaintiff also complained of urinary urgency. Dr. Peeples noted plaintiff to have fractured her pelvis in a motor vehicle accident in 1985 and to have undergone numerous surgical procedures, including laparoscopy, hysteroscopy, tubal ligation, hysterectomy, and lumbar diskectomy. Plaintiff reported her only medications to be Tylenol #3 and ibuprofen, taken as needed. Dr. Peeples noted plaintiff to exhibit fatigue and depressive symptoms. Plaintiff's affect was somewhat dysphoric. Physical examination was noted to be "rather benign" with no paravertebral muscle spasm and no point tenderness over the

vertebral column. Motor examination was normal and plaintiff's biceps, triceps, brachial radialis, knee and ankle jerks were 2+ and symmetric. There was no evidence of radicular or peripheral nerve pattern of sensory loss in the extremities. Straight leg raising was negative. Dr. Peeples reported the etiology of plaintiff's present symptoms to be indeterminate but expressed the possibilities of demyelinating disorder, cervical radiculopathy or somatization. MRI scans of both the brain and cervical spine were ordered. (Tr. 280-81.)

Results of an MRI of plaintiff's cervical spine, performed February 3, 1998, were essentially negative. (Tr. 285.) Results of an MRI performed on plaintiff's brain that same date were negative. (Tr. 286.) Results of an MRI of the thoracic spine performed on February 6, 1998, showed mild spondylitic change at the T9-T10 level, but were otherwise negative. (Tr. 283-84.)

Plaintiff visited Dr. Peeples on February 12, 1998, and complained of continued mid-thoracic pain. Dr. Peeples noted plaintiff to also complain of a number of "curious symptoms," including instability, pain and numbness in both arms. Plaintiff complained of "just not being right." Physical examination showed no point tenderness over the thoracic spine. Plaintiff had full range of movement of the cervical spine. No reflex, motor or sensory abnormalities were noted in the upper extremities. Dr. Peeples reported that he needed to see the thoracic spine studies and possibly order nerve conduction studies. Dr. Peeples opined

that if such studies were negative, he would not have much to offer plaintiff other than referral to a pain center.  (Tr. 452.)

Plaintiff telephoned Dr. Peeples later on February 12, 1998, and reported that she threw her low back out again. Plaintiff requested an immediate MRI scan of the lumbar spine.  Dr. Peeples reported that he "didn't feel that this was appropriate without re-evaluating her; and if she felt that this situation was acute enough, she would have to go to the emergency room to be evaluated."  (Tr. 282.)

An MRI taken of plaintiff's lumbar spine on February 20, 1998, showed disc space narrowing at L5-S1.  Results of an MRI of plaintiff's bilateral hips were negative.  (Tr. 304-05.)

On February 20, 1998, plaintiff visited Dr. Lee W. Tempel, a neurologist, for evaluation of persistent back pain. Plaintiff reported her medical history and provided Dr. Tempel with her MRI reports and films, her diskectomy operative report, and Dr. Peeples's office visit notes.  Plaintiff currently complained of pain in her right hip; neck; and her low, middle and upper back; and of numbness in her left arm into the middle three fingers.  She also complained of shooting pain into the left arm and occasionally to the right arm.  Dr. Tempel noted plaintiff to have more dramatic symptoms subsequent to her normal MRI's and took note of plaintiff's statements, specifically, that "'any little thing' can make her start to feel shaky, not be able to walk straight, fall, etc.  'As soon as I lay down, the muscles just start flapping all

over the place.' She then says, 'There has to be a reason . . . I don't know why this is happening.'" (Tr. 296.) Dr. Tempel noted that plaintiff had applied for Social Security Disability and was scheduled for examination by a physician for disability determination "very soon." Dr. Tempel also noted plaintiff's desire to delay such disability examination until a neurologist could "really find out what is going wrong." (Tr. 296.) Upon conclusion of his examination, Dr. Tempel concluded that plaintiff had "persistent, multi-level back pain," noting:

> She continues to have increasingly worse complaints of pain, now not only at the low back but also the hips and now extending up into the thoracic and cervical spine, as well as tingling/pain into the medial arms. Her sensory exam is inconsistent (light touch versus pin prick) and also does not conform well to a peripheral nerve or dermatomal distribution. There is some give way weakness when strength is tested at the bedside, but then when doing functional tests she does quite well. I am not able to find other objective signs of an upper motor neurone or lower motor neurone deficit. Admittedly, she is a difficult exam because of some exaggeration during that period.
>
> Given her increasing difficulties and potential long-term consequences, I think we should fully explore any objective evidence of a process that could potentially be primarily neurologic in origin. She just within the past few weeks has had MRI imaging of the brain, cervical spine, and thoracic spine, which do not show any evidence of central demyelination or other central process. That also would not support a structural cause of radicular pathology at these levels.

(Tr. 297.)

Dr. Tempel noted that he would review the previous MRI films.  He also ordered EMG/NCV studies of the left upper and left lower extremities and the right if indicated by the electromyographer, plain films of the hips, pelvis and lumbosacral spine, and a repeat MRI of the lumbosacral spine.  Dr. Tempel noted, "I have already expressed my concern that there may not be a primary 'neurologic' process, and that she might have musculoskeletal reasons for initiating pain, but that then (resultant) affective problems may have accentuated the perception of that pain, and she may have entered a 'chronic pain syndrome.'"  (Tr. 297.)  On February 23, 1998, Dr. Tempel reviewed plaintiff's previous MRI films and noted them to be unremarkable.  (Tr. 291.)

On March 2, 1998, plaintiff underwent EMG/NCV testing by Dr. Barbara J. Green.  Upon physical examination, Dr. Green noted that plaintiff had slight weakness of hip flexion on her left side. Left upper extremity grip strength and finger abduction and adduction strength was observed to be slightly decreased as compared to the right.  Thumb abduction was also observed to be somewhat diminished on the left.  Dr. Green also reported pin sensation to be slightly decreased over the left lateral calf and the bottom of the left foot as compared to the right.  Upon testing, however, Dr. Green noted the tests to be normal and that there was no "definite electrodiagnostic evidence of any upper extremity nor left lower extremity compression mononeuropathy nor

of a left cervical or left lumbar radiculopathy.  There is also no evidence of any mid to lower thoracic radiculopathy on the left."  (Tr. 293-94.)

An MRI of plaintiff's lumbar spine performed on March 2, 1998, showed degenerative endplate spurring with some postoperative change on the left at L5-S1 with minimal postoperative epidural fibrosis medial to the left S1 root.  There was no evidence of herniation.  (Tr. 300-03.)

On March 10, 1998, Dr. Tempel telephoned plaintiff and left a message informing her that the plain films, EMG/NCV and MRI were all unremarkable for a primary neurologic cause of pain.  Dr. Tempel further advised plaintiff to seek a primary physician to pursue non-neurologic causes of the pain or management of chronic pain syndrome at a pain center.  (Tr. 290.)

On June 15, 1998, plaintiff saw Dr. Richard Wittenborn, a neurologist.  Plaintiff complained of shooting pains and numbness from the middle of her back under her shoulder blades, radiating down her left arm into her fingers.  She also complained of chronic lower back pain, and of pain and numbness in her left leg and foot.  Plaintiff also stated that she had shooting pains in the middle of her back and around her side with pain sometimes in her neck and face creating numbness, pain and a cold, wet feeling.  Plaintiff claimed that the pain occurred two or three times a week, but that she experienced the low back discomfort every day.  Plaintiff stated that once the pain begins, it lasts all day.  Plaintiff

reported the pain not to interfere with her life. Dr. Wittenborn noted plaintiff to have about fifty percent of the somatic symptoms of depression but mentioned only a few of the affective symptoms. Upon physical examination, Dr. Wittenborn noted that plaintiff had increased tone in the muscles of the posterior cervical region extending into the trapezial ridge. He also noted a decreased range of motion of the neck in all directions including the oblique movements. Dr. Wittenhorn reported mild tenderness in the mid-thoracic region at about T8. Plaintiff complained about a bulge or lump that appeared to be hyperostosis of the T2 costosternal junction. Dr. Wittenhorn determined plaintiff to be a chronic pain patient who now had symptoms involving the mid-thoracic region. Dr. Wittenhorn observed that plaintiff had undergone extensive imaging but that none had resulted in a diagnosis. Dr. Wittenborn suggested plaintiff's condition be considered a myofascial pain syndrome and physical therapy was recommended. Dr. Wittenhorn recommended that plaintiff take Daypro and Soma,[12] and that she take amitriptyline[13] at bedtime. Dr. Wittenhorn also recommended a CT

_____

[12]Soma is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 3252 (55th ed. 2001).

[13]Amitriptyline is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat post-herpetic neuralgia (the burning, stabbing pains, or aches that may last for months or years after a shingles infection), Medline Plus (last revised Aug. 1, 2007)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

scan to look at the area that appeared to be hyperostotic to rule out anything "unusual," opining that plaintiff could have seronegative arthritis. (Tr. 308-10.)

CT scans taken July 13, 1998, of the thoracic spine and chest were normal. (Tr. 311.)

On November 9, 2002, plaintiff visited Ozark Health Systems complaining of experiencing a cough and of an exacerbation of low back pain. Plaintiff's surgical history was noted, including kidney stone removal and hysterectomy. It was also noted that plaintiff had previously suffered a fractured pelvis in a motor vehicle accident and that she had had back problems. Plaintiff appeared to be uncomfortable and walked with a stilted gait. (Tr. 435.) Plaintiff complained that the pain radiated into her left leg and increased with movement. Physical examination showed plaintiff to have limited range of motion and paraspinous spasms. Straight leg raising was negative. (Tr. 436.) Plaintiff was diagnosed with acute exacerbation of low back pain and was prescribed Decadron, Depo-Medrol,[14] Skelaxin,[15] Vicodin,[16] and

_____

[14]Decadron and Depo-Medrol are steroids primarily used for their potent anti-inflammatory effect. Physicians' Desk Reference 1914, 2594 (55th ed. 2001).

[15]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

[16]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

Naproxen.[17]  Plaintiff was instructed to follow up with her primary care physician if her condition had not improved within three days. (Tr. 435.)

## IV.  The ALJ's Decision

The ALJ found that the plaintiff met the disability insured status requirements of the Social Security Act on July 28, 1996, but was no longer insured after September 30, 2000.  The ALJ found that the plaintiff had not engaged in substantial gainful activity since July 28, 1996.  The ALJ found that plaintiff had been more than minimally limited by discogenic and degenerative disorders of the spine and myofascial pain syndrome, but that plaintiff's impairment(s) did not meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ further found plaintiff's allegations not to be credible. The ALJ found that within twelve months of July 28, 1996, and since that time, plaintiff has had the residual functional capacity to lift up to ten pounds; stand or walk a total of two hours in an eight-hour day with regular breaks; sit six hours in an eight-hour day with an option to sit/stand or shift positions as needed; and occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or ramps.  The ALJ found plaintiff unable to climb ladders, ropes or scaffolds, and to have the need to avoid concentrated exposure

_____

[17]Naproxen is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain.  Physicians' Desk Reference 2744-45 (55th ed. 2001).

to vibration. (Tr. 332-33.) The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, education and work experience, the ALJ found vocational expert testimony to support a finding that plaintiff had been able to perform other work as it exists in the national economy since July 28, 1996. Therefore, the ALJ found that the plaintiff had not been disabled and thus was not entitled to or eligible for a Period of Disability, Disability Insurance Benefits or Supplemental Security Income. (Tr. 333.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42

31

U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's

findings may still be supported by substantial evidence.  <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)).  A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome.  <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

As an initial matter, the undersigned notes that subsequent to the ALJ's adverse decision in this cause, plaintiff submitted additional medical records to the Appeals Council, including records from Dr. Sanjay Ghosh dated April 19, 2005, to June 16, 2005 (<u>see</u> Tr. 315), which show Dr. Ghosh to have diagnosed plaintiff in April 2005 with fibromyalgia and to have rendered treatment therefore.  (Pltf.'s Resp. to Court Order/Doc. No. 27.) The Appeals Council did not consider Dr. Ghosh's records, however, for the sole reason that they were "beyond the date of the [ALJ's] decision[.]" (Tr. 315.)  Instead, the Appeals Council returned Dr. Ghosh's records, and others, to the plaintiff.  (<u>Id.</u>)

In the instant appeal, plaintiff claims, <u>inter</u> <u>alia</u>, that the Commissioner erred by failing to consider plaintiff's condition of fibromyalgia as diagnosed by Dr. Ghosh.  Plaintiff argues that fibromyalgia is often misdiagnosed and that such diagnosis is often delayed due to the failure of physicians to recognize the condition.  Plaintiff contends that, indeed, a review of the record shows that during the relevant period, plaintiff presented to several physicians complaints which were consistent with her

33

subsequent diagnosis of fibromyalgia.  Plaintiff argues that the Commissioner may not disregard Dr. Ghosh's diagnosis of fibromyalgia merely because the diagnosis itself was not rendered until after the onset date of plaintiff's alleged disabling impairment.  Plaintiff's argument is well taken.  See Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990).

Where new and material evidence is submitted to the Appeals Council subsequent to the ALJ's decision,

> the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.

20 C.F.R. §§ 404.970(b), 416.1470(b).

"Thus the Appeals Council *must* consider evidence submitted with a request for review if it is '(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000) (quoting Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995)).  Failure to consider such evidence constitutes a basis for remand by a reviewing court. Box, 52 F.3d at 172; see also Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).  "Whether evidence meets this criteria is a question of law . . . review[ed] *de novo*." Bergmann, 207 F.3d at

1069.

The Appeals Council here returned Dr. Ghosh's records to plaintiff and did not consider them for the sole reason that the records were "beyond the date of the [ALJ's] decision[.]"  In light of plaintiff's challenge to the Commissioner's failure to consider these records, the undersigned determines it necessary to conduct a *de novo* review of the Appeals Council's decision not to consider such evidence.  For purposes of this review, and in accordance with this Court's Order of July 24, 2007, plaintiff has submitted to the Court the relevant records from Dr. Ghosh (Doc. No. 27, denoted as Pltf.'s Exh. A) which show as follows:

On April 19, 2005, plaintiff visited Dr. Sanjay Ghosh and complained of constant, moderate and dull pain in her neck, low back, shoulders, left arm, and hands.  Plaintiff reported the pain to increase with exertion and that nothing decreases the pain. Plaintiff reported that she experiences stiffness in the morning for two hours.  Dr. Ghosh noted plaintiff's current medications to

include Oxycontin,[18] Percocet,[19] Darvocet,[20] Vistaril,[21] Tramadol,[22] and Valium.[23]   Physical examination showed 1+ tenderness in the cervical and lumbar spine without muscle spasm.   Plaintiff was nontender about the thoracic spine, ribs and pelvis.   Plaintiff had normal gait and station.   Examination of the extremities showed plaintiff to have 1+ tenderness with trace swelling in the wrists, fingers and PIP's.   Tenderness without swelling was noted about the elbows and shoulders with normal range of motion.   Plaintiff's hips, knees, ankles, toes, and DIP's were not tender.   Dr. Ghosh noted twelve of eighteen tender points to be present.   Plaintiff had decreased light touch in both legs.   Muscle strength in the upper extremities was measured to be 5/5; 4/5 in the legs.   Dr. Ghosh diagnosed plaintiff with inflammatory arthritis – symmetrical

---

[18]Oxycontin is indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days.  Physicians' Desk Reference, 2697-98 (55th ed. 2001).

[19]Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1211 (55th ed. 2001).

[20]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

[21]Vistaril is useful for therapy in the management of anxiety, tension and psychomotor agitation.  Physicians' Desk Reference 2541 (55th ed. 2001).

[22]Tramadol (Ultram) is indicated for the management of moderate to moderately severe pain.  Physicians' Desk Reference 2398-99 (55th ed. 2001).

[23]Valium is indicated for the management of anxiety disorders.  Physicians' Desk Reference 2814 (55th ed. 2001).

polyarthritis, for which blood tests were ordered and Plaquenil[24] was prescribed. Dr. Ghosh also diagnosed plaintiff with fibromyalgia and back pain, for which he instructed plaintiff to continue with Valium and her other pain medications. The results of various laboratory tests performed that same date at the Arthritis Internal Medicine and Pain Clinic showed plaintiff to have an elevated rheumatoid factor.

Plaintiff returned to Dr. Ghosh on May 11, 2005, and complained of continued pain in her neck, low back, arms, and legs. Tenderness was noted about the cervical spine and lumbar spine. Mild tenderness was noted about the fingers, PIP's, wrist, elbows, shoulders, and right ankle. No tenderness was noted about the knees or left ankle. Noting the elevated rheumatoid factor, Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis and prescribed Methotrexate[25] for plaintiff. On that same date, Dr. Ghosh completed a Physician's Statement for Disabled Person's License Plate/Placard, certifying that plaintiff had a permanent disability

---

[24]Plaquenil is used to treat discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. Medline Plus (last revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601240.html>.

[25]Methotrexate is used, inter alia, to treat severe, active rheumatoid arthritis that cannot be controlled by certain other medications. Due to its very serious side effects, patients "should only use methotrexate to treat life-threatening cancer, or certain other conditions that are very severe and that cannot be treated with other medications." Medline Plus (last revised Oct. 1, 2006)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682019.html>.

in that she could not ambulate or walk fifty feet without stopping "due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition."

On June 16, 2005, plaintiff reported to Dr. Ghosh that she had not noticed an improvement with Methotrexate. Plaintiff complained of constant, moderate, dull pain in the low back, hands, wrists, elbows, and shoulders. Plaintiff reported the pain to increase with exertion and to decrease to some extent with current medications. Plaintiff reported that she experiences more fatigue and that she continues to have morning stiffness for two hours. Dr. Ghosh noted plaintiff's current medications to include Oxycontin, Percocet, Darvocet, Vistaril, Tramadol, and Valium, Plaquenil, and Methotrexate. Physical examination showed tenderness in the cervical and lumbar spine without muscle spasm, as well as tenderness with trace swelling about the wrists, fingers and shoulders. No tenderness was noted about plaintiff's thoracic spine, ribs, pelvis, elbows, knees, hips, ankles, and toes. Plaintiff had normal muscle strength and tone. Dr. Ghosh continued to diagnose plaintiff with rheumatoid arthritis and additional medication, Remicade,[26] was prescribed. Dr. Ghosh also instructed plaintiff to continue with her Percocet, Valium and Tramadol for her low back pain.

---

[26]Remicade is indicated for the reduction in signs and symptoms of rheumatoid arthritis in patients who have had an inadequate response to methotrexate. Physicians' Desk Reference 1085-86 (55th ed. 2001).

As noted above, the Appeals Council determined not to review Dr. Ghosh's records for the sole reason that they were beyond the date of the ALJ's decision, which, in this cause, was rendered in May 2003. This reason alone is insufficient to find Dr. Ghosh's records not to be new or material under §§ 404.970(b), 416.1470(b). <u>Williams</u>, 905 F.2d at 216.

> The timing of the examination is not dispositive of whether evidence is material. If it were, all evidence obtained after the date of an ALJ decision would fail to meet the new and material standard. Medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision.

<u>Id.</u>

For the following reasons, the undersigned finds the records of Dr. Ghosh to be new and material, and the matter must be remanded to the Commissioner for further consideration.

In <u>Brosnahan v. Barnhart</u>, 336 F.3d 671 (8th Cir. 2003), the Eighth Circuit recognized that fibromyalgia is a chronic condition involving inflammation of the fibrous and connective tissue, "causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue." <u>Id.</u> at 672 n.1. Diagnosis of fibromyalgia is "usually made after eliminating other conditions, as there are no confirming diagnostic tests." <u>Id.</u> Consistent trigger-point findings and consistent complaints during frequent physicians' visits of variable and unpredictable pain, stiffness,

fatigue, and ability to function provide evidence of fibromyalgia, which can be disabling.  Id. at 678.

Beginning in 1996, plaintiff saw a number of doctors, including specialists, and consistently complained of symptoms consistent with her allegations of limitation, and consistent with those signs and symptoms upon which Dr. Ghosh ultimately rendered a diagnosis of fibromyalgia.  This diagnosis, although rendered twenty-three months after the ALJ's decision, came after years of testing, multiple physicians visits, and unsuccessful treatment. See Cline v. Sullivan, 939 F.2d 560 (8th Cir. 1991).  As in Cline, it appears here that plaintiff's prior physicians did not "perform[] the necessary examinations to properly diagnose [plaintiff's] affliction."  Id. at 566-67.  Although plaintiff's actual _diagnosis_ of fibromyalgia came after the ALJ's adverse decision in this cause, such diagnosis is consistent with the signs and symptoms that plaintiff experienced beginning in 1996, on a condition at issue before the ALJ which existed prior to the decision, for which plaintiff was unable to obtain a proper diagnosis or successful treatment.  See, e.g., id. at 568; contra Box, 52 F.3d at 172 (new evidence rejected by Appeals Council did not relate to period prior to ALJ's decision, and record did not indicate that such conditions existed during relevant period).

Accordingly, the undersigned finds Dr. Ghosh's records to relate to plaintiff's condition as it existed on or before the

ALJ's decision in May 2003. The Appeals Council therefore erred by failing to consider such records when reviewing the ALJ's decision. Williams v. Sullivan, 905 F.2d 214 (8th Cir. 1990). As such, it cannot be said that the Appeals Council reviewed the entire record when it determined not to review the ALJ's decision inasmuch as it failed to consider new and material evidence of plaintiff's impairment(s) relating to the period on or before the ALJ's adverse decision. Therefore, the cause should be remanded for inclusion of such evidence and for proper consideration by the Appeals Counsel of the entire record thereafter. Box, 52 F.3d at 172. If upon consideration of this new evidence the Appeals Council continues to decline review of the ALJ's decision, the matter then comes for judicial review for determination as to whether there is substantial evidence in the administrative record, which would then include the new evidence, to support the ALJ's decision. Nelson, 966 F.2d at 366.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that, pursuant to sentence six of 42 U.S.C. § 405(g), this cause is remanded to the Commissioner for further administrative proceedings, and specifically, for inclusion in the administrative record of Dr. Sonjay Ghosh's medical records dated April 19 to June 16, 2005, to be considered by the Appeals Council in determining whether to review the ALJ's adverse decision

in this cause.[27]

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this __1st__ day of October, 2007.

---

[27]It is the Commissioner's duty to file with the district court the results of the proceedings upon remand.  42 U.S.C. § 405(g).