UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DEBORAH M. BAKER,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    No.  4:05CV2253 FRB
                                     )
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
                Defendant.           )


**MEMORANDUM AND ORDER**

This cause is before the Court on plaintiff's appeal of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural Background

On January 13, 1998, plaintiff Deborah M. Baker filed an application for Disability Insurance Benefits (Tr. 81-83) and Supplemental Security Income (Tr. 43-44) pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq. In her applications for benefits, plaintiff claimed that she became disabled and unable to work because of her disabling condition on July 28, 1996. On initial consideration and reconsideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 46-56, 59-64, 67-71.) Upon request by the plaintiff, a hearing was held before an Administrative Law Judge (ALJ) on March 29, 1999. Plaintiff

testified at the hearing and was represented by counsel. (Tr. 20-42.)  On April 7, 1999, the ALJ issued a decision denying plaintiff's claims for benefits, specifically finding that plaintiff could perform her past relevant work. (Tr. 10-19.)  On August 15, 2000, the Appeals Council denied plaintiff's request for review of the ALJ's adverse decision.  (Tr. 4-6.)  The ALJ's determination was thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

On September 21, 2000, plaintiff appealed the Commissioner's adverse decision to this Court, see Baker v. Halter, Cause No. 4:00CV1526 FRB (E.D. Mo. 2000) ("Baker I"), and raised the following arguments to support her request that the Commissioner's decision be reversed:  1) that the ALJ failed to give appropriate weight to plaintiff's subjective complaints, and 2) that the ALJ erred in not obtaining the testimony of a vocational expert.  In a Memorandum and Order entered March 29, 2002, the Court found that the ALJ's adverse decision lacked any meaningful discussion of much of the evidence of record in relation to the factors required to be considered under Polaski v. Heckler[1] in determining a claimant's credibility.  Given this lack of discussion, the Court found that it could not be said that the ALJ's credibility determination was based on substantial evidence on the record as a whole.  Accordingly, the cause was remanded to

_____

[1] 739 F.2d 1320 (8th Cir. 1984).

the Commissioner for re-evaluation of the record. (See Baker I, Memo. & Order, Docket No. 15, at pp. 27-36.) The Court determined not to review plaintiff's claim regarding vocational expert testimony inasmuch as such review would have been premature given the ALJ's finding that plaintiff could return to her past relevant work. (Id. at pp. 36-37.) Judgment was entered that same date reversing the Commissioner's decision and remanding the matter to the Commissioner for further proceedings. No appeal was taken by either party from this Court's Judgment.

Upon remand to the Commissioner, the Appeals Council vacated the previous decision of the Commissioner and remanded the matter to an ALJ to conduct further proceedings consistent with the Court's Memorandum and Order in Baker I. (Tr. 389-90.) Thereafter, a subsequent hearing was held before an ALJ on April 10, 2003, at which plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. (Tr. 335-78.) On May 19, 2003, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 322-34.) On October 4, 2005, upon consideration of some additional evidence,[2] the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 315-18.) The ALJ's adverse decision of May 19, 2003, was thus the final decision of the Commissioner. 42 U.S.C.

---

[2]Plaintiff submitted additional medical records to the Appeals Council for review. The Appeals Council retained only some of these records for consideration and returned the other unreviewed records to plaintiff. (Tr. 315.)

§ 405(g).  On November 30, 2005, plaintiff filed the instant cause of action seeking judicial review of this second adverse decision.

Defendant Commissioner answered plaintiff's Complaint in this cause on June 7, 2006, with such Answer including the administrative transcript of the proceedings before the Social Security Administration.  Upon review of the transcript, the Court noted it to be incomplete inasmuch as there were pages and complete records missing, thereby depriving this Court of a meaningful review of the Commissioner's decision.  On July 24, 2007, the Commissioner was ordered to submit to the Court the missing pages and records.  In addition, plaintiff was ordered to submit to the Court certain medical records that she submitted to, but were not considered by, the Appeals Council in her request for review of the ALJ's decision.[3]  The Court ordered this submission so that a *de novo* review could be conducted as to whether these records constituted new, material and relevant evidence which the Appeals Council was required to consider.  (See Order, Docket No. 22.)  The parties timely complied with this Order.

Upon review of the complete administrative transcript in conjunction with the medical records submitted by plaintiff, the undersigned determined the Appeals Council to have erred in failing to consider the submitted medical records inasmuch as *de novo*

---

[3]The Appeals Council returned these records to the plaintiff and thus were not a part of the administrative transcript.

review showed them to be new and material and to have related to plaintiff's condition as it existed on or before the ALJ's decision in May 2003. This Court therefore ordered this cause to be remanded to the Commissioner with instructions to include these additional medical records in the administrative record and, further, for the Appeals Council to consider such records in determining whether to review the ALJ's adverse decision. (See Memo. & Order, Docket No. 28.)

Upon remand, the Appeals Council considered the additional evidence ordered to be submitted and continued in its determination to deny plaintiff's request for review of the ALJ's decision. (Tr. 455-46.) The ALJ's adverse determination of May 19, 2003, thus continues to be the final decision of the Commissioner. 42 U.S.C. § 405(g).

The matter was reopened in this Court on February 20, 2008. The parties have filed their respective briefs with respect to the Commissioner's adverse decision. The matter is now before the Court, again, for resolution.

**II. Administrative Hearing Before the ALJ Upon First Remand**

A. <u>Plaintiff's Testimony</u>

At the hearing on April 10, 2003, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was thirty-six years of age. (Tr. 338.) Plaintiff stands five-feet, six inches tall and weighs 117 pounds.

Plaintiff is right-handed. (Tr. 340.) Plaintiff is married and has an eight-year-old son. Plaintiff completed high school. In 1986, plaintiff received a one-year certificate in data entry. (Tr. 339.)

Plaintiff testified that for approximately seven years, she worked as a medical aide/receptionist in medical offices using her data entry skills. (Tr. 339.) Plaintiff testified that she stopped working in July 1994 after her maternity leave had expired. Plaintiff testified that she was experiencing back pain at that time and wanted to spend more time at home with her newborn son. (Tr. 358-59.) Plaintiff testified that she has not updated her skills or been retrained since that time. (Tr. 339.) Plaintiff testified that in 1990 and 1991, she also performed general secretarial duties but left such employment because she was moving to another state. (Tr. 359.) Prior to such work, plaintiff testified that she "worked normal teenage jobs[.]" (Tr. 340.) Plaintiff testified that she could not perform her previous work because of the pain she experiences, her inability to sit still for a long time, and that her employment would probably be terminated because she would miss too many days of work. (Tr. 350-51, 359.)

Plaintiff testified that she broke her pelvis in an automobile accident in 1986. (Tr. 346, 361.) Plaintiff testified that she also injured her back and neck in the accident. Plaintiff testified that she also had fibroids, polyps, cysts, two or three D & C's, an ovary removed, two miscarriages, kidney stones, and

6

underwent leg surgery.  (Tr. 346.)

Plaintiff testified that she started experiencing pain in 1993 and 1994 and that the birth of her son in 1994 exacerbated the pain and "really brought the onset[.]"  (Tr. 340.)  Plaintiff testified that she began experiencing pain in her left leg in 1996. (Tr. 363.)  Plaintiff testified that her back condition, herniated disc and degenerative disease cause her the most pain.  Plaintiff testified that she has a herniated disc at the L4-L5 level and that she underwent back surgery in 1997 to remove a disc to relieve compression.  Plaintiff testified that prior to surgery, she could not feel her legs and toes and could not walk.  (Tr. 341.) Plaintiff testified that the back surgery did not resolve her pain and that subsequent to surgery, certain activities, such as lifting too much, or standing or sitting a certain way for too long caused the nerve in her back to pinch which would exacerbate the pain. (Tr. 360.)  Plaintiff testified that she underwent two other back procedures on an outpatient basis for the administration of nerve blocks in attempts to relieve the pain not resolved by the previous back surgery.  (Tr. 341-42.)  Plaintiff testified that the nerve blocks actually worsened her pain for a period of four or five days, and that the pain would then subside to its previous level. (Tr. 342-43.)

Plaintiff testified that prior to 1994, she exercised, did laundry, cleaned the house, and rode her bicycle.  (Tr. 361.) Plaintiff testified that subsequent to her back surgery, she could

7

perform only basic household chores, such as making beds and sorting laundry, but that she received assistance with housecleaning. (Tr. 366-67.) Plaintiff testified that in addition to her husband's help, she received help in caring for her son when he was younger in that a woman would take him into her home three days a week. (Tr. 351.) Plaintiff testified that she also received help from her parents when they were around. (Tr. 352.) Plaintiff testified that, during that time, she could sit or stand for fifteen to twenty minutes before she needed to shift her position on account of pain. (Tr. 367-68.) Plaintiff testified that, during that time, she could lift and carry nothing heavier than a gallon of milk. Plaintiff testified that her back pain remained the same through 2000, but that she was able to regain feeling in her toes through rehabilitation. (Tr. 370.)

Plaintiff testified that her back pain now prevents her from lifting heavy loads of laundry and from engaging in certain types of bending or stooping for very long periods of time. Plaintiff testified that trying to do too much aggravates her pain. (Tr. 343.) On a scale of one-to-ten, plaintiff testified that her pain is mostly at a level seven or eight and is at a level five when she is feeling her best. (Tr. 344.) To relieve the pain, plaintiff testified that she has a heating pad attached to her chair "non-stop," that she takes a bath every night, and that she takes Ultram and over-the-counter pain medication. (Tr. 343-44.) Plaintiff testified that sitting straight against a support helps

to "push the nerve back in place" and gives her greater comfort than slouching. (Tr. 344.) Plaintiff testified that her back pain radiates to her legs, arms, fingers, and neck. (Tr. 344-45.) Plaintiff testified that her fingers, left arm, the left side of her face, and the toes on her left foot go cold and numb. (Tr. 345.) Plaintiff testified that she did not experience such conditions prior to her back surgery. (Tr. 371.) Plaintiff testified that such conditions prevent her from moving her arm a certain way and cause her concern with cooking and doing the dishes given the coldness of her fingers. (Tr. 372.) Plaintiff testified that she was diagnosed in 1999 as having bone spurs of the thoracic spine between the shoulders and that she believed such condition was the cause of the coldness in her neck, face, arm, and back. (Tr. 348.)

Plaintiff testified that she had seasonal allergy problems prior to 2000 and that she took over-the-counter medication for the condition. (Tr. 348-49.) Plaintiff testified that she also had certain female conditions before 2000 which were thought to be the cause of her back and hip pain. Plaintiff testified that she had multiple surgeries and finally a hysterectomy, but that it was ultimately determined that she had herniated discs. Plaintiff testified that her female conditions affected her ability to work only when she had to be off of work subsequent to the surgeries. (Tr. 347.)

Plaintiff testified that she also experienced urinary/

bladder problems prior to 2000 in that she would have to urinate ten or eleven times during the day and get up four or five times in the night to urinate. (Tr. 349-50.) Plaintiff testified that she was diagnosed with kidney stones and diverticulum of the bladder and underwent surgery on her left kidney in 2000. Plaintiff testified that her doctors continue to monitor her bladder condition. (Tr. 350.)

As to her daily activities, plaintiff testified that she has been unable to sweep and mop or lift heavy loads of laundry since her back surgery. Plaintiff testified that she uses a dishwasher, but that standing long periods of time to do the dishes is difficult. (Tr. 353.) Plaintiff testified that she rests during the day and that the heating pad on her chair helps her back pain. (Tr. 353-54.) Plaintiff testified that she goes to bed around 9:00 p.m. Plaintiff testified that she wakes her son at 6:00 a.m. and that he catches the bus to school at 6:40 a.m. Plaintiff testified that she does not prepare daytime meals for her son because he eats at school. Plaintiff testified that she prepares dinner and mostly uses prepackaged foods such as macaroni and cheese and fish sticks. (Tr. 354.)

B.  Testimony of Vocational Expert

James Israel, a vocational expert, testified at the hearing in response to questions posed by counsel and the ALJ. Mr. Israel testified that plaintiff's past work as a medical receptionist was at the light exertional level of work and that

plaintiff has no transferable skills from such employment because of her time away from such work and the change in technology from the time she performed such work.  (Tr. 373.)

The ALJ asked Mr. Israel to assume an individual of thirty years of age with post high school education and with plaintiff's work experience as indicated by the evidence.  The ALJ asked Mr. Israel to assume that such an individual could lift ten pounds; could stand and walk for a total of not more than two hours in an eight-hour work day with regular breaks; could sit for a total of six hours in a regular work day; and would need a sit/ stand option as needed between standing, walking and sitting.  (Tr. 373-74.)  The ALJ further asked Mr. Israel to assume that such a person could not climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; could occasionally stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to vibration.  (Tr. 374.)  Mr. Israel testified that such an individual could not perform plaintiff's past relevant work.  Mr. Israel testified that such an individual could perform other work such as cashier, of which 3,500 such jobs existed in the State of Missouri in 2002; general office clerk, of which 2,500 such jobs existed in the State of Missouri in 2002; order clerk, of which 1,000 such jobs existed in the State of Missouri in 2002; and sales counter clerk, of which 3,500 existed in the State of Missouri in 2002.  (Tr. 375.)

The ALJ then asked Mr. Israel to assume that the sit/

stand option for the individual must include the ability for the individual to sit for a period of fifteen to twenty minutes, then stand for fifteen to twenty minutes, return to sitting for fifteen to twenty minutes, etc., instead of merely standing to stretch and then return to sitting. (Tr. 375-76.) Mr. Israel testified that such a person would be unable to sustain employment. (Tr. 376.)

### III. Medical Records[4]

On June 1, 1995, plaintiff was admitted to Lake Forest Hospital for a diagnostic hysteroscopy and D&C (dilation and curettage) in response to plaintiff's complaints of dysfunctional bleeding. Dr. Michael J. Hubbell noted plaintiff to have tolerated the procedure well and experienced no complications. Plaintiff was discharged that same date.[5] (Tr. 179-83.)

---

[4]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes dated November 9, 2002; and Missouri Baptist Hospital treatment notes and reports from February 12, 1998, through June 27, 2001. (Tr. 434-54.) Additional evidence was submitted to and considered by the Appeals Council upon the second remand of this cause. This evidence consists of medical records from Dr. Sanjay Ghosh dated April 19, 2005, to June 16, 2005, as well as a Residual Functional Capacity Assessment completed by Dr. Ghosh on July 11, 2005. (Tr. 458-74.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

[5]The doctor performing the procedure, Dr. Michael J. Hubbell, did not provide medical records when requested by the Social Security Administration. A letter from Dr. Hubbell dated January 29, 1998, stated: "I have no opinion regarding Deborah Baker's claim of disability. I suggest you contact her orthopedic

12

On May 24, 1996, plaintiff was again admitted to Lake Forest Hospital for a total abdominal hysterectomy and bilateral salpingo-oophorectomy. Hospital records indicate that plaintiff had experienced chronic pelvic pain and chronic dysfunctional uterine bleeding that was unresponsive to various hormonal and surgical regimens. Dr. Hubbell noted there to be no complications and that plaintiff tolerated the procedure well. Plaintiff was discharged from the hospital on May 26, 1996. (Tr. 170-77.)

On July 25, 1996, plaintiff saw Dr. Richard Kortan, a chiropractor, for complaints of hip pain. Dr. Kortan diagnosed the plaintiff with left sacral ileitis, lumbar neuritis and lumbalgia. From July 25 through August 9, 1996, plaintiff visited Dr. Kortan on five occasions during which Dr. Kortan applied traction, manipulation, and electrical stimulation plus moist heat to the lumbar spine with mild improvement noted. Dr. Kortan recommended that plaintiff undergo orthopedic consultation. (Tr. 189-91.)

On August 12, 1996, plaintiff visited Dr. Bruce Hamming on referral for an orthopedic evaluation. (Tr. 196.) Plaintiff complained of pain and of a mass in her left buttock region that she had noticed approximately eight months prior. Plaintiff reported the mass to become larger with activity and to shrink with inactivity. Dr. Hamming noted a soft tissue bulge in the upper sacroiliac region of the left buttock and opined that it was most

physician, Dr. Rowley (sp?) regarding this claim." (Tr. 260.)

likely a benign mass, but could be a cyst from the sacroiliac joint. Dr. Hamming recommended that plaintiff have an MRI of the area to define the mass and its characteristics and to determine whether surgery was needed. (Tr. 195.) An MRI of the hip and buttock region taken on August 16, 1996, was essentially unremarkable. (Tr. 274.)

Plaintiff returned to Dr. Hamming on September 16, 1996, and reported no improvement in her symptoms. On September 17, 1996, Dr. Hamming noted a small mole close to where plaintiff felt swelling and discomfort. Dr. Hamming discussed treatment options and the negative MRI with plaintiff and recommended that she return in one month for a recheck. (Tr. 194.)

Plaintiff returned to Dr. Hamming on November 19, 1996, and reported that Daypro[6] had helped her condition but that she continued to have deep burning pain in the buttock region, sometimes radiating to the thigh. Plaintiff reported the pain to be worse with sitting rather than with being up and moving around. Dr. Hamming noted plaintiff to have no back pain. Plaintiff could forward flex and touch her fingers to the floor. Dr. Hamming observed the pain not to appear directly related to the hip joints or to the sacroiliac joint. Dr. Hamming opined that there could be nerve irritation in the lower back or in relation to plaintiff's

---

[6]Daypro is indicated for acute and long-term use in the management of the signs and symptoms of osteoarthritis and rheumatoid arthritis. Physicians' Desk Reference 2993 (55th ed. 2001).

prior abdominal surgery. Dr. Hamming recommended that plaintiff see a neurologist. (Tr. 194.)

On December 3, 1996, plaintiff visited Dr. Wilbur F. Rowley, a neurologist. Plaintiff reported to Dr. Rowley that she broke her pelvis in a motor vehicle accident when she was nineteen years of age, and that she healed "nicely" from that injury and subsequently underwent pelvic surgery in 1992 for the removal of ovarian cysts. (Tr. 201.) Plaintiff reported to Dr. Rowley that she underwent a hysterectomy in 1996 and complained that, since that time, she has experienced pain in the left gluteal hip sacroiliac region with occasional pain spreading down into the hamstring area and into the left knee. Plaintiff also complained of an occasional numb, tingling sensation down the back of the left gluteal hamstring area. Dr. Rowley noted plaintiff to have had cortisone injections without benefit. Plaintiff reported no symptoms relevant to the right leg, neck or upper extremities. Review of systems was unremarkable. Neurologic examination showed plaintiff to have full range of motion of the neck. Straight leg raising was negative. No percussion pain was noted about the lumbosacral spine. Pedal pulses were noted to be intact. Motor examination was normal. Heel, toe and tandem walking was noted to be normal. Plaintiff could hop without difficulty and could reach down and touch her fingertips to the floor. Dr. Rowley recommended a CT scan of the abdomen and pelvis to rule out any problems in the retroperitoneal space, particularly on the left; an MRI of the

lumbosacral spine to rule out any disk disease or cysts; plain films of the lumbosacral spine; and electrodiagnostic studies of the low back and left lower extremity. (Tr. 201-04.)

On January 7, 1997, plaintiff underwent a CT scan of her abdomen and pelvis, which showed a cystic mass in the lower left pelvis which deviated the left colon and produced some pressure upon the left wall of the bladder. The reviewing physician, Dr. Adelaide Gomez, reported the mass to have a benign appearance but noted that cyst aspiration under CT or ultrasound guidance might be helpful for better evaluation. (Tr. 200.)

On January 8, 1997, plaintiff called Dr. Rowley's office requesting the name of an obstetrician/gynecologist. Dr. Rowley recommended that plaintiff call "Dr. Allen" to schedule an appointment for the next day and to advise him of her CT and MRI testing.[7] (Tr. 199.)

On January 8, 1997, plaintiff underwent an MRI of the lumbar spine which showed an L4-5 disc bulge and a small-to-moderate-sized left-sided disc extrusion at L5-S1. (Tr. 271.)

On January 9, 1997, Dr. Rowley noted that he received a call from Dr. Hubbell, plaintiff's treating obstetrician/gynecologist, who reported that plaintiff had called him and was very upset. Dr. Rowley reported to Dr. Hubbell that plaintiff had demanded to "see somebody else" and that he had given her the name

---

[7]Nothing in the record shows plaintiff to have ever visited a "Dr. Allen."

16

of another gynecologist.  (Tr. 198.)

In a letter dated January 9, 1997, Dr. Meneleo E. Avila informed Dr. Rowley of his findings made as a result of a neurosurgical consultation with plaintiff performed that same date. In the letter, Dr. Avila reported that plaintiff complained to him that she had experienced pain in her left lower quadrant and left low back since her hysterectomy in May 1996 and that her doctor advised her that the hysterectomy entailed lysis of adhesions in the left lower quadrant between the uterus, small intestine and colon.  Plaintiff reported that after her pain persisted for over a week, Dr. Hubbell advised the plaintiff to see a chiropractor but that the chiropractic treatments did not relieve her pain. Plaintiff reported that she continued to have some vaginal bleeding which Dr. Hubbell told her was due to some "dog ears" which were cauterized in the area of the surgery.  Plaintiff reported that she was referred to Dr. Hamming for orthopedic evaluation and that steroid injections administered by Dr. Hamming to the left sacral area provided no significant relief.  Plaintiff also reported that she was prescribed Oruvail[8] and Daypro which also failed to give her significant relief.  Plaintiff reported that a CT scan of her pelvis showed a pelvic mass and that she saw Dr. Spellman, an obstetrician, and was told there were no hard masses in the pelvis

---

[8]Oruvail is indicated for the management of the signs and symptoms of rheumatoid arthritis and osteoarthritis.  Physicians' Desk Reference 3411 (55th ed. 2001)

but that she was sore. Plaintiff reported that Dr. Spellman recommended an ultrasound evaluation.[9] (Tr. 208-11.)

During his consultation, Dr. Avila reviewed the MRI taken January 8, 1997, and noted it to show a herniated disc at L5-S1 with marked compression and enlargement of the left S1 root. Plaintiff currently complained of pain in her left low back and left iliac crest inguinal region down the left lower extremity with numbness and tingling in her left leg. Dr. Avila noted plaintiff to have constant pain and to have marked difficulty sitting in a chair. Plaintiff could walk on her heels and on her toes. An inequality of strength was noted with repeated toe standings on her left and right side. Plaintiff rated her pain level at an eight on a scale of one to ten. Dr. Avila noted that upon sensory examination, plaintiff had numbness and tingling of her left leg and that the pinprick sensation seemed slightly lesser on the left lateral foot than on the right. Dr. Avila reported that plaintiff's ankle reflexes were asymmetrical: the right was 2+ and the left was absent. Dr. Avila also noted that plaintiff's left gastrocnemius muscle was weak compared to the right and that the plaintiff could not sustain repeated toe stands on the left side. Plaintiff's straight leg raising was positive for pain on the left side at thirty degrees of elevation. Dr. Avila concluded that plaintiff had a left L5-S1 herniated disc with S1 radiculopathy.

_____

[9]The transcript contains no medical records from Dr. Spellman.

He also concluded that she had residual pain in the left pelvis as a result of her hysterectomy in 1996. Dr. Avila offered two treatment options: 1) lumbar epidural blocks for pain relief or 2) a lumbar microdiskectomy to remove the disc herniation. Plaintiff determined to undergo the lumbar microdiskectomy. (Tr. 208-11.)

Plaintiff underwent a lumbar microdiskectomy on January 13, 1997. Dr. Avila noted plaintiff to have tolerated the procedure well. (Tr. 236-37.)

On February 10, 1997, plaintiff followed up with Dr. A. Rabin regarding the microdiskectomy. Plaintiff complained of continued pain in her lower back and left hip and of numbness and tingling in her legs. Upon examination, Dr. Rabin diagnosed plaintiff with status post microdiskectomy L5-S1, left S1 radiculopathy, and lower back pain. Dr. Rabin ordered physical therapy with concentration on range of motion of the thoracolumbar spine, with such therapy to include heat, electrical stimulation and an exercise program. (Tr. 228-29.) Thereafter, plaintiff underwent physical therapy at Saint Therese Medical Center approximately twice a week from February 14 to May 14, 1997. (Tr. 240-45.)

In a letter dated April 8, 1997, Dr. Avila updated Dr. Rowley as to plaintiff's condition since her January 1997 microdiskectomy. Dr. Avila reported that plaintiff had experienced an improvement in the amount of her pain in the left lower extremity and left low back and that he had referred her to Drs.

Rabin and Nanda for rehabilitation of her back. It was noted that plaintiff reported that she attends rehabilitation three times a week but that she experienced more problems with pelvic pain on the left side which radiates to the back of her left sacrum into her left buttock, producing extreme pain radiating down her left leg. Plaintiff also reported experiencing pain down the right leg. Plaintiff further reported that she returned to her previous gynecologist, Dr. Hubbell, and had not continued to see Dr. Spellman. Plaintiff reported that Dr. Herbert Beck, a gynecological oncologist, told her that she had three peritoneal cysts in the left pelvic area between the rectum and the sacrum with cyst leak.[10] Plaintiff reported that she had never been diagnosed with endometriosis nor was ever told that there were endometrial cysts seeding in her peritoneum. Dr. Avila opined that the presence of cysts in the peritoneum would cause the pain in plaintiff's legs of which she complained. Upon examination, plaintiff reported continued pain in the left iliac crest and lower abdominal area and of continued numbness in the left lower extremity. Plaintiff had no left ankle reflex. Plaintiff was able to raise her left leg to eighty degrees which demonstrated improvement from the thirty-degree level previously observed. Plaintiff was able to walk well without any pain. Dr. Avila concluded that plaintiff had fair results from the lumbar

---

[10]The transcript contains no medical records from Dr. Beck.

diskectomy with relief of a lot of the pain down her left lower extremity, and opined that "the residual pain she feels could be secondary to the pelvic component of her problem." It was noted that plaintiff was in the process of selling her home and moving to St. Louis. Dr. Avila thus recommended to plaintiff that she obtain a copy of the pathology report from her hysterectomy to take to St. Louis with her to rule out endometriosis. Inasmuch as plaintiff was "doing a lot of moving in her home at the present time," Dr. Avila prescribed Tylenol #3 for pain and instructed plaintiff to take such medication sparingly.[11] (Tr. 206-07.)

On May 7, 2007, plaintiff reported to Dr. Rabin that she felt better with much less lower back pain and more mobility. Dr. Rabin noted plaintiff to have increased extension when standing. On May 14, 2007, plaintiff reported that she was sore in the iliac region. Dr. Rabin noted plaintiff's range of motion to be improving. Dr. Rabin instructed plaintiff to continue with abdominal stretching but to discontinue physical therapy. (Tr. 240.)

On September 10, 1997, plaintiff underwent an MRI in response to her complaints of pain. The MRI showed a bulging/minor protruding disc at L4-5 which was mildly indenting the ventral thecal sac. Dr. Friedman reviewed plaintiff's previous MRI and

---

[11]Tylenol #3 (Tylenol with codeine) is indicated for the relief of mild to moderately severe pain. Physicians' Desk Reference 2397 (55th ed. 2001).

noted the bulging disc to be either unchanged or minimally more prominent than in January 1997. Dr. Friedman also noted degenerative and postoperative changes at the L5-S1 which were related to plaintiff's January 1997 surgery. (Tr. 263-65.)

An ultrasound examination of plaintiff's abdomen and pelvis performed on September 22, 1997, upon the order of Dr. Hubbell, was normal with no evidence of masses. (Tr. 178.)

On October 13, 1997, Dr. Raghavender Thunga performed a caudal epidural steroid injection as well as two trigger point injections in response to plaintiff's complaints of pain. Dr. Thunga noted the injections to provide 100 percent relief. Plaintiff's diagnoses were noted to be myofascial pain[12] accounting for about fifty percent of plaintiff's pain, lumbosacral radiculopathy accounting for the other fifty percent of plaintiff's pain, and psychosocial stressors. Dr. Thunga instructed plaintiff to return in two or three weeks for a repeat injection and also considered psychiatric treatment for plaintiff, such as prescribing Elavil. (Tr. 218-24, 238.) On October 21, 1997, plaintiff

---

[12]Myofascial pain syndrome is a chronic form of muscle pain. The pain of myofascial pain syndrome centers around sensitive points in the muscles called trigger points. The trigger points in the muscles can be painful when touched, and the pain can spread throughout the entire muscle. Myofascial Pain Syndrome, Mayo Clinic Staff (Nov. 30, 2007), *available at* <http:// www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042>. Symptoms of myofascial pain syndrome and fibromyalgia are very similar. Myofascial Pain Syndrome (MPS) and Fibromyalgia (2008), *available at* <http://www.fibromyalgia-symptoms.org/fibromyalgia_ mysofacial.html>.

reported to Dr. Thunga that she felt better overall although she still had pain.  Dr. Thunga noted that there were no complications from the procedure.  (Tr. 238.)  On November 10, 1997, plaintiff reported that she had pain for two to three days after the first procedure and then good relief for one to two weeks.  With the second caudal epidural procedure performed on November 10, plaintiff stated she felt more relief than after the first procedure.  (Tr. 213-17, 239.)

On January 27, 1998, plaintiff visited Dr. A.B. Gross, a chiropractor, and reported experiencing pain and numbness in her left arm down to her outer three fingers.  Physical examination showed a fifty percent loss of grip strength in plaintiff's left arm and an absence of the brachial reflex, biceps reflex and triceps reflex in the left arm.  Dr. Gross noted tenderness in the mid-thoracic spine and some tenderness in the lower cervical spine. Dr. Gross referred plaintiff to Dr. Peeples.  (Tr. 254-57.)

Plaintiff visited Dr. David M. Peeples, a neurologist, on February 2, 1998.  Plaintiff complained of chronic low back pain, left leg pain and a three-month history of mid and upper back and neck pain with left upper extremity numbness.  Plaintiff also complained of urinary urgency.  Dr. Peeples noted plaintiff to have fractured her pelvis in a motor vehicle accident in 1985 and to have undergone numerous surgical procedures, including laparoscopy, hysteroscopy, tubal ligation, hysterectomy, and lumbar diskectomy. Plaintiff reported her only medications to be Tylenol #3 and

ibuprofen, taken as needed.  Dr. Peeples noted plaintiff to exhibit fatigue and depressive symptoms.  Plaintiff's affect was somewhat dysphoric.  Physical examination was noted to be "rather benign" with no paravertebral muscle spasm and no point tenderness over the vertebral column.  Motor examination was normal and plaintiff's biceps, triceps, brachial radialis, knee and ankle jerks were 2+ and symmetric.  There was no evidence of radicular or peripheral nerve pattern of sensory loss in the extremities.  Straight leg raising was negative.  Dr. Peeples reported the etiology of plaintiff's present symptoms to be indeterminate but expressed the possibilities of demyelinating disorder, cervical radiculopathy or somatization.  MRI scans of both the brain and cervical spine were ordered.  (Tr. 280-81.)

Results of an MRI of plaintiff's cervical spine, performed February 3, 1998, were essentially negative.  (Tr. 285.) Results of an MRI performed on plaintiff's brain that same date were negative.  (Tr. 286.)  Results of an MRI of the thoracic spine performed on February 6, 1998, showed mild spondylitic change at the T9-T10 level, but were otherwise negative.  (Tr. 283-84.)

Plaintiff visited Dr. Peeples on February 12, 1998, and complained of continued mid-thoracic pain.  Dr. Peeples noted plaintiff to also complain of a number of "curious symptoms," including instability, pain and numbness in both arms.  Plaintiff complained of "just not being right."  Physical examination showed no point tenderness over the thoracic spine.  Plaintiff had full

range of movement of the cervical spine. No reflex, motor or sensory abnormalities were noted in the upper extremities. Dr. Peeples reported that he needed to see the thoracic spine studies and possibly order nerve conduction studies. Dr. Peeples opined that if such studies were negative, he would not have much to offer plaintiff other than referral to a pain center. (Tr. 452.)

Plaintiff telephoned Dr. Peeples later on February 12, 1998, and reported that she threw her low back out again. Plaintiff requested an immediate MRI scan of the lumbar spine. Dr. Peeples reported that he "didn't feel that this was appropriate without re-evaluating her; and if she felt that this situation was acute enough, she would have to go to the emergency room to be evaluated." (Tr. 282.)

An MRI taken of plaintiff's lumbar spine on February 20, 1998, showed disc space narrowing at L5-S1. Results of an MRI of plaintiff's bilateral hips were negative. (Tr. 304-05.)

On February 20, 1998, plaintiff visited Dr. Lee W. Tempel, a neurologist, for evaluation of persistent back pain. Plaintiff reported her medical history and provided Dr. Tempel with her MRI reports and films, her diskectomy operative report, and Dr. Peeples's office visit notes. Plaintiff currently complained of pain in her right hip; neck; and her low, middle and upper back; and of numbness in her left arm into the middle three fingers. She also complained of shooting pain into the left arm and occasionally to the right arm. Dr. Tempel noted plaintiff to have more dramatic

symptoms subsequent to her normal MRI's and took note of plaintiff's statements, specifically, that "'any little thing' can make her start to feel shaky, not be able to walk straight, fall, etc. 'As soon as I lay down, the muscles just start flapping all over the place.' She then says, 'There has to be a reason . . . I don't know why this is happening.'" (Tr. 296.) Dr. Tempel noted that plaintiff had applied for Social Security Disability and was scheduled for examination by a physician for disability determination "very soon." Dr. Tempel also noted plaintiff's desire to delay such disability examination until a neurologist could "really find out what is going wrong." (Tr. 296.) Upon conclusion of his examination, Dr. Tempel concluded that plaintiff had "persistent, multi-level back pain," noting:

> She continues to have increasingly worse complaints of pain, now not only at the low back but also the hips and now extending up into the thoracic and cervical spine, as well as tingling/pain into the medial arms. Her sensory exam is inconsistent (light touch versus pin prick) and also does not conform well to a peripheral nerve or dermatomal distribution. There is some give way weakness when strength is tested at the bedside, but then when doing functional tests she does quite well. I am not able to find other objective signs of an upper motor neurone or lower motor neurone deficit. Admittedly, she is a difficult exam because of some exaggeration during that period.
>
> Given her increasing difficulties and potential long-term consequences, I think we should fully explore any objective evidence of a process that could potentially be primarily neurologic in origin. She just within the

> past few weeks has had MRI imaging of the
> brain, cervical spine, and thoracic spine,
> which do not show any evidence of central
> demyelination or other central process. That
> also would not support a structural cause of
> radicular pathology at these levels.

(Tr. 297.)

Dr. Tempel noted that he would review the previous MRI films. He also ordered EMG/NCV studies of the left upper and lower extremities and the right if indicated by the electromyographer, plain films of the hips, pelvis and lumbosacral spine, and a repeat MRI of the lumbosacral spine. Dr. Tempel noted, "I have already expressed my concern that there may not be a primary 'neurologic' process, and that she might have musculoskeletal reasons for initiating pain, but that then (resultant) affective problems may have accentuated the perception of that pain, and she may have entered a 'chronic pain syndrome.'" (Tr. 297.) On February 23, 1998, Dr. Tempel reviewed plaintiff's previous MRI films and noted them to be unremarkable. (Tr. 291.)

On March 2, 1998, plaintiff underwent EMG/NCV testing by Dr. Barbara J. Green. Upon physical examination, Dr. Green noted that plaintiff had slight weakness of hip flexion on her left side. Left upper extremity grip strength and finger abduction and adduction strength was observed to be slightly decreased as compared to the right. Thumb abduction was also observed to be somewhat diminished on the left. Dr. Green also reported pin sensation to be slightly decreased over the left lateral calf and

the bottom of the left foot as compared to the right. Upon testing, however, Dr. Green noted the tests to be normal and that there was no "definite electrodiagnostic evidence of any upper extremity nor left lower extremity compression mononeuropathy nor of a left cervical or left lumbar radiculopathy. There is also no evidence of any mid to lower thoracic radiculopathy on the left." (Tr. 293-94.)

An MRI of plaintiff's lumbar spine performed on March 2, 1998, showed degenerative endplate spurring with some postoperative change on the left at L5-S1 with minimal postoperative epidural fibrosis medial to the left S1 root. There was no evidence of herniation. (Tr. 300-03.)

On March 10, 1998, Dr. Tempel telephoned plaintiff and left a message informing her that the plain films, EMG/NCV and MRI were all unremarkable for a primary neurologic cause of pain. Dr. Tempel further advised plaintiff to seek a primary physician to pursue non-neurologic causes of the pain or management of chronic pain syndrome at a pain center. (Tr. 290.)

On June 15, 1998, plaintiff saw Dr. Richard Wittenborn, a neurologist. Plaintiff complained of shooting pains and numbness from the middle of her back under her shoulder blades, radiating down her left arm into her fingers. She also complained of chronic lower back pain, and of pain and numbness in her left leg and foot. Plaintiff also stated that she had shooting pains in the middle of her back and around her side with pain sometimes in her neck and

28

face creating numbness, pain and a cold, wet feeling. Plaintiff claimed that the pain occurred two or three times a week, but that she experienced the low back discomfort every day. Plaintiff stated that once the pain begins, it lasts all day. Plaintiff reported the pain not to interfere with her life. Dr. Wittenborn noted plaintiff to have about fifty percent of the somatic symptoms of depression but mentioned only a few of the affective symptoms. Upon physical examination, Dr. Wittenborn noted that plaintiff had increased tone in the muscles of the posterior cervical region extending into the trapezial ridge. He also noted a decreased range of motion of the neck in all directions including the oblique movements. Dr. Wittenhorn reported mild tenderness in the mid-thoracic region at about T8. Plaintiff complained about a bulge or lump that appeared to be hyperostosis of the T2 costosternal junction. Dr. Wittenhorn determined plaintiff to be a chronic pain patient who now had symptoms involving the mid-thoracic region. Dr. Wittenhorn observed that plaintiff had undergone extensive imaging but that none had resulted in a diagnosis. Dr. Wittenborn suggested plaintiff's condition be considered a myofascial pain syndrome and physical therapy was recommended. Dr. Wittenhorn recommended that plaintiff take Daypro and Soma,[13] and that she take

---

[13]Soma is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 3252 (55th ed. 2001).

amitriptyline[14] at bedtime. Dr. Wittenhorn also recommended a CT scan to look at the area that appeared to be hyperostotic to rule out anything unusual, opining that plaintiff could have seronegative arthritis. (Tr. 308-10.)

CT scans taken July 13, 1998, of the thoracic spine and chest were normal. (Tr. 311.)

On November 9, 2002, plaintiff visited Ozark Health Systems complaining of experiencing a cough and of an exacerbation of low back pain three days prior. Plaintiff's surgical history was noted, including kidney stone removal and hysterectomy. It was also noted that plaintiff had previously suffered a fractured pelvis in a motor vehicle accident and that she had had back problems. Plaintiff's current medications were noted to be Tylenol, Motrin and Ultram. Plaintiff appeared to be uncomfortable and walked with a stilted gait. (Tr. 435.) Plaintiff complained that the pain radiated into her left leg and increased with movement. Physical examination showed plaintiff to have limited range of motion and paraspinous spasms. Straight leg raising was negative. (Tr. 436.) Plaintiff was diagnosed with acute exacerbation of low back pain and was prescribed Decadron, Depo-

---

[14]Amitriptyline is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat post-herpetic neuralgia (the burning, stabbing pains, or aches that may last after a shingles infection), Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html>.

Medrol,[15] Skelaxin,[16] Vicodin,[17] and Naproxen.[18] Plaintiff was instructed to follow up with her primary care physician if her condition had not improved within three days. (Tr. 435.)

On April 19, 2005, plaintiff visited Dr. Sanjay Ghosh and complained of constant, moderate and dull pain in her neck, low back, shoulders, left arm, and hands. Plaintiff reported the pain to increase with exertion and that nothing decreased the pain. Plaintiff reported that she experiences stiffness in the morning for two hours. Dr. Ghosh noted plaintiff's current medications to

---

[15]Decadron and Depo-Medrol are steroids primarily used for their potent anti-inflammatory effect. Physicians' Desk Reference 1914, 2594 (55th ed. 2001).

[16]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

[17]Vicodin is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

[18]Naproxen is indicated for the treatment of rheumatoid arthritis, osteoarthritis, ankylosing spondylitis, and for the management of pain. Physicians' Desk Reference 2744-45 (55th ed. 2001).

include Oxycontin,[19] Percocet,[20] Darvocet,[21] Vistaril,[22] Tramadol,[23] and Valium.[24]   Physical examination showed 1+ tenderness in the cervical and lumbar spine without muscle spasm.   Plaintiff was nontender about the thoracic spine, ribs and pelvis.   Plaintiff had normal gait and station.   Examination of the extremities showed plaintiff to have 1+ tenderness with trace swelling in the wrists, fingers and PIP's.   Tenderness without swelling was noted about the elbows and shoulders with normal range of motion.   Plaintiff's hips, knees, ankles, toes, and DIP's were not tender.   Dr. Ghosh noted twelve of eighteen tender points to be present.   Plaintiff had decreased light touch in both legs.   Muscle strength in the upper extremities was measured to be 5/5; 4/5 in the legs.   Dr. Ghosh diagnosed plaintiff with inflammatory arthritis – symmetrical

---

[19]Oxycontin is indicated for the management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days.  Physicians' Desk Reference, 2697-98 (55th ed. 2001).

[20]Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference 1211 (55th ed. 2001).

[21]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

[22]Vistaril is useful for therapy in the management of anxiety, tension and psychomotor agitation.  Physicians' Desk Reference 2541 (55th ed. 2001).

[23]Tramadol (Ultram) is indicated for the management of moderate to moderately severe pain.  Physicians' Desk Reference 2398-99 (55th ed. 2001).

[24]Valium is indicated for the management of anxiety disorders. Physicians' Desk Reference 2814 (55th ed. 2001).

polyarthritis, for which blood tests were ordered and Plaquenil[25] was prescribed. Dr. Ghosh also diagnosed plaintiff with fibromyalgia and back pain, for which he instructed plaintiff to continue with Valium and her other pain medications. The results of various laboratory tests performed that same date at the Arthritis Internal Medicine and Pain Clinic showed plaintiff to have an elevated rheumatoid factor. (Tr. 461, 464-67.)

Plaintiff returned to Dr. Ghosh on May 11, 2005, and complained of continued pain in her neck, low back, arms, and legs. Tenderness was noted about the cervical spine and lumbar spine. Mild tenderness was noted about the fingers, PIP's, wrist, elbows, shoulders, and right ankle. No tenderness was noted about the knees or left ankle. Noting the elevated rheumatoid factor, Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis and prescribed Methotrexate[26] for plaintiff. (Tr. 461.) Bone imaging studies performed that same date showed osteopenia. (Tr. 459.) On that same date, Dr. Ghosh completed a Physician's Statement for Disabled Person's License Plate/Placard, certifying that plaintiff had a permanent disability in that she could not ambulate or walk fifty

---

[25]Plaquenil is used to treat discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html>.

[26]Methotrexate is used, inter alia, to treat severe, active rheumatoid arthritis that cannot be controlled by certain other medications. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682019.html>.

feet without stopping "due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." (Tr. 460.)

On June 16, 2005, plaintiff reported to Dr. Ghosh that she had not noticed an improvement with Methotrexate. Plaintiff complained of constant, moderate, dull pain in the low back, hands, wrists, elbows, and shoulders. Plaintiff reported the pain to increase with exertion and to decrease to some extent with current medications. Plaintiff reported that she experiences more fatigue and that she continues to have morning stiffness for two hours. Dr. Ghosh noted plaintiff's current medications to include Oxycontin, Percocet, Darvocet, Vistaril, Tramadol, Valium, Plaquenil, and Methotrexate. Physical examination showed tenderness in the cervical and lumbar spine without muscle spasm, as well as tenderness with trace swelling about the wrists, fingers and shoulders. No tenderness was noted about plaintiff's thoracic spine, ribs, pelvis, elbows, knees, hips, ankles, and toes. Plaintiff had normal muscle strength and tone. Dr. Ghosh continued to diagnose plaintiff with rheumatoid arthritis and additional medication, Remicade,[27] was prescribed. Dr. Ghosh also instructed plaintiff to continue with her Percocet, Valium and Tramadol for her low back pain. (Tr. 458.)

---

[27]Remicade is indicated for the reduction in signs and symptoms of rheumatoid arthritis in patients who have had an inadequate response to Methotrexate. Physicians' Desk Reference 1085-86 (55th ed. 2001).

In a Physical Residual Functional Capacity Assessment completed July 11, 2005, Dr. Ghosh opined that plaintiff could sit, stand, walk, or work less than one hour each in an eight-hour work day. Dr. Ghosh further opined that plaintiff could never lift or carry anything of any weight, including less than ten pounds. Dr. Ghosh opined that plaintiff could not engage in repetitive action with either hand, such as simple grasping, pushing and pulling, or fine manipulation. Dr. Ghosh reported that plaintiff's rheumatoid arthritis, with positive rheumatoid factor, evidenced plaintiff's inability to engage in simple grasping and pushing and pulling. Dr. Ghosh opined that plaintiff could not use either or both of her feet for repetitive movements, such as operating foot controls. Dr. Ghosh further opined that plaintiff could never bend, squat, crawl, climb, reach above, stoop, crouch, or kneel. Dr. Ghosh opined that plaintiff could tolerate continual exposure to unprotected heights; exposure to marked temperature changes; exposure to dust, fumes and gases; and exposure to noise. Dr. Ghosh opined that plaintiff could tolerate occasional exposure to driving automotive equipment, but that plaintiff could not tolerate any exposure to being around moving machinery. Dr. Ghosh described plaintiff's pain as severe and continuous, and reported her rheumatoid arthritis and history of multiple back surgeries to constitute the medically determinable impairments which caused such pain. Dr. Ghosh noted sensory disruption of the left arm to objectively indicate plaintiff's pain, with complaints of pain and

grimacing to be subjective indicators. Dr. Ghosh opined that plaintiff was severely limited in her ability engage in physical activities, such as walking, standing, lifting, bending, sitting, pace, and stamina. Dr. Ghosh opined that plaintiff had no limitations in mental activities, such as concentrating, remembering, reasoning, and following instructions. Dr. Ghosh further opined that plaintiff's pain limited her social functioning, that is, interacting with others, socializing and personal hygiene. Dr. Ghosh reported that activity incited plaintiff's pain, and that such pain was relieved by pain medication. Dr. Ghosh noted plaintiff's medications to include Oxycontin, Percocet, Tramadol, Remicade, and Methotrexate and reported plaintiff to have undergone pain management. Finally, Dr. Ghosh opined that plaintiff should not work because of multiple joint pain and back pain. (Tr. 470-74.)

## IV. The ALJ's Decision

The ALJ found that the plaintiff met the disability insured status requirements of the Social Security Act on July 28, 1996, but was no longer insured after September 30, 2000.[28] The ALJ found that the plaintiff had not engaged in substantial gainful activity since July 28, 1996. The ALJ found that plaintiff had been more than minimally limited by discogenic and degenerative

---

[28]For Title II purposes, therefore, plaintiff had to show a disability on or before September 30, 2000. For Title XVI purposes, plaintiff had to show a disability on or before the date of the ALJ's decision, that is, May 19, 2003.

disorders of the spine and myofascial pain syndrome, but that plaintiff's impairment(s) did not meet or medically equal an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. The ALJ further found plaintiff's allegations not to be credible. The ALJ found that within twelve months of July 28, 1996, and since that time, plaintiff has had the residual functional capacity to lift up to ten pounds; stand or walk a total of two hours in an eight-hour day with regular breaks; sit six hours in an eight-hour day with an option to sit/stand or shift positions as needed; and occasionally balance, stoop, kneel, crouch, crawl, and climb stairs or ramps. The ALJ found plaintiff unable to climb ladders, ropes or scaffolds, and to have the need to avoid concentrated exposure to vibration. (Tr. 332-33.) The ALJ found plaintiff unable to perform her past relevant work. Considering plaintiff's age, education and work experience, the ALJ found vocational expert testimony to support a finding that plaintiff had been able to perform other work as it exists in the national economy since July 28, 1996. Therefore, the ALJ found that the plaintiff had not been disabled and thus was not entitled to or eligible for a Period of Disability, Disability Insurance Benefits or Supplemental Security Income. (Tr. 333.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security

Act, plaintiff must prove that she is disabled. <u>Pearsall v.</u>
<u>Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary</u>
<u>of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The
Social Security Act defines disability as the "inability to engage
in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months." 42 U.S.C. §§
423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared
disabled "only if [her] physical or mental impairment or
impairments are of such severity that [she] is not only unable to
do [her] previous work but cannot, considering [her] age,
education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy." 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

        To determine whether a claimant is disabled, the
Commissioner engages in a five-step evaluation process. <u>See</u> 20
C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42
(1987). The Commissioner begins by deciding whether the claimant
is engaged in substantial gainful activity. If the claimant is
working, disability benefits are denied. Next, the Commissioner
decides whether the claimant has a "severe" impairment or
combination of impairments, meaning that which significantly limits
her ability to do basic work activities. If the claimant's
impairment(s) is not severe, then she is not disabled. The

Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints

39

relating to exertional and non-exertional
activities and impairments.

5.   Any corroboration by third parties of the
     plaintiff's impairments.

6.   The testimony of vocational experts when
     required which is based upon a proper
     hypothetical question which sets forth
     the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86
(8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85
(8th Cir. 1989)).


The Court must also consider any evidence which fairly detracts
from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d
1047, 1050 (8th Cir. 1999).  However, even though two inconsistent
conclusions may be drawn from the evidence, the Commissioner's
findings may still be supported by substantial evidence.  Pearsall,
274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th
Cir. 2000)).  A Commissioner's decision may not be reversed merely
because substantial evidence also exists that would support a
contrary outcome.  Jones ex rel. Morris v. Barnhart, 315 F.3d 974,
977 (8th Cir. 2003).

     Plaintiff claims that the ALJ's decision is not supported
by substantial evidence on the record as a whole.  Specifically,
plaintiff contends that the Commissioner erred by disregarding
plaintiff's diagnosed condition of fibromyalgia merely because such
condition was not affirmatively diagnosed until several years after
its onset.  Plaintiff also argues that the ALJ failed to evaluate
the combined effect of all of her impairments.  Plaintiff further

40

contends that the ALJ erred by requiring objective medical evidence of plaintiff's pain and by injecting his own medical opinion regarding the seriousness of plaintiff's pain. Plaintiff also argues that the ALJ did not fully evaluate the record and should have ordered additional tests to further develop the record. Finally, plaintiff argues that disability cannot be denied on account of the availability of work which is "merely conceivable and not reasonably possible." The undersigned will address each of plaintiff's contentions in turn.

A.  <u>Failure to Consider Fibromyalgia</u>

Plaintiff argues that the Commissioner erred by failing to consider plaintiff's diagnosed impairment of fibromyalgia merely because such diagnosis was not made until several years after its onset. This argument was raised in plaintiff's initial Brief and was decided in her favor in this Court's Memorandum and Order of October 1, 2007, which resulted in this cause being remanded to the Commissioner with specific direction that such evidence be considered. (<u>See</u> Docket No. 28.) A review of the Supplemental Transcript shows the Appeals Council to have thoroughly considered the substance of this evidence in its determination not to review the ALJ's decision. (Tr. 455-56.) For the plaintiff to now argue that the Commissioner failed to consider this evidence and provided an insufficient basis upon which not to consider it, is without merit.

Nevertheless, to the extent plaintiff's claim may be

construed to argue that plaintiff's 2005 diagnosis of fibromyalgia demonstrates that she suffered a disabling condition during the relevant period, the undersigned will proceed to consider such a claim.

Plaintiff argues that fibromyalgia is often misdiagnosed and that such diagnosis is often delayed due to the failure of physicians to recognize the condition. Plaintiff contends that a review of the record shows that, indeed, during the relevant period, plaintiff presented complaints to several physicians which were consistent with her subsequent diagnosis of fibromyalgia. In Brosnahan v. Barnhart, 336 F.3d 671 (8th Cir. 2003), the Eighth Circuit recognized that fibromyalgia is a chronic condition involving inflammation of the fibrous and connective tissue, "causing long-term but variable levels of muscle and joint pain, stiffness, and fatigue." Id. at 672 n.1. Diagnosis of fibromyalgia is "usually made after eliminating other conditions, as there are no confirming diagnostic tests." Id. Consistent trigger-point findings and consistent complaints during frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function provide evidence of fibromyalgia, which can be disabling. Id. at 678.

Beginning in 1996, plaintiff saw a number of doctors, including specialists, and consistently complained of symptoms consistent with those signs and symptoms upon which Dr. Ghosh ultimately rendered a diagnosis of fibromyalgia. This diagnosis,

42

although rendered twenty-three months after the ALJ's decision, came after years of testing, multiple physicians visits, and unsuccessful treatment. See Cline v. Sullivan, 939 F.2d 560 (8th Cir. 1991). As in Cline, it appears here that plaintiff's prior physicians did not "perform[] the necessary examinations to properly diagnose [plaintiff's] affliction." Id. at 566-67. Although plaintiff's actual *diagnosis* of fibromyalgia came after the ALJ's adverse decision in this cause, such diagnosis is consistent with the signs and symptoms that plaintiff experienced beginning in 1996, on a condition at issue before the ALJ which existed prior to the decision, for which plaintiff was unable to obtain a proper diagnosis or successful treatment. See, e.g., id. at 568.

However, merely because the *diagnosis* did not come until after the ALJ's decision does not mean that the effect such condition had on plaintiff's ability to function was not considered. As noted above, the signs, symptoms and complaints were all a part of the record before the ALJ -- only the actual formal diagnosis of "fibromyalgia" was absent. A review of the ALJ's decision shows him to have considered the effects of this as-yet unnamed impairment based on the documented signs and symptoms consistent therewith and to have determined that plaintiff was not

so limited such that she could not perform any work activity.[29] Substantial evidence supports this decision.  See, e.g., Hamilton v. Astrue, 518 F.3d 607 (8th Cir. 2008) (claimant diagnosed with fibromyalgia nevertheless demonstrated normal flexion and extension, normal range of motion, normal straight leg raising, no muscle spasm, no muscle weakness or atrophy, essentially normal gait, good strength); Casey v. Astrue, 503 F.3d 687 (8th Cir. 2007) (claimant diagnosed with fibromyalgia nevertheless demonstrated full range of motion, no pain with range of motion of hips, negative straight leg raising, tenderness in low back but stable thoracic spine, relief with steroid injections).  The subsequent formal diagnosis made by Dr. Ghosh based upon these same signs, symptoms and complaints, does not change this conclusion.

B.   Combined Effect of Impairments

Plaintiff contends that the ALJ failed to consider the combined effect of all of plaintiff's impairments, including chronic pain, herniated disc, degenerative disc disease, kidney stones, bone spurs, allergies, and history of fractured pelvis.

It is well established that the failure to consider the combined effects of physical and mental impairments "violates the Social Security Act and constitutes reversible error." Pratt v. Sullivan, 956 F.2d 830, 835 (8th Cir. 1992).   Where an ALJ

---

[29]Indeed, a review of the ALJ's decision shows him to have determined plaintiff's condition of myofascial pain syndrome, a condition similar in symptomatic form to fibromyalgia, to constitute a severe impairment.

44

separately discusses the claimant's impairments and complaints of pain, as well as her level of activity, it cannot be reasonably said that the ALJ failed to consider the claimant's impairments in combination. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992). This is precisely what the ALJ did here.

The ALJ separately discussed plaintiff's discogenic and degenerative disorders of the spine as well as her myofascial pain syndrome and determined such impairments to be severe. The ALJ then went on to note that the medical record was devoid of any evidence to support plaintiff's allegations of pelvis fracture, bone spurring, and urinary problems. As such, the ALJ determined these conditions not to be medically determinable impairments. 20 C.F.R. §§ 404.1508, 416.908 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."). Finally, the ALJ discussed plaintiff's allergies and found them not to be severe, noting specifically that they were treated only by over-the-counter medications.

In conjunction with his discussion of plaintiff's multiple alleged impairments, the ALJ discussed in great detail plaintiff's complaints of pain and the evidence of record which supported, as well as detracted from, such complaints. When addressing plaintiff's complaints of pain, the ALJ specifically noted plaintiff's symptoms and considered the effect such symptoms

45

had on plaintiff's ability to engage in work-related activity. Indeed, in assessing plaintiff's RFC, the ALJ found, "by and large, as the claimant asserts." (Tr. 331.) Further, the ALJ's hypothetical question posed to the vocational expert, upon whose testimony the ALJ relied in his determination, included the limitations imposed by plaintiff's impairments the ALJ found to be credible and supported by the evidence on the record as a whole. Inasmuch as the question posed to the vocational expert considered the effects of all of plaintiff's impairments found by the ALJ to be credible, plaintiff's claim that the ALJ failed to consider the combined effect of her impairments is without merit. E.g., Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000).

C.    Evidence of Plaintiff's Pain

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may discount subjective complaints of pain if there are inconsistencies in the evidence as a whole, he may not do so solely because the complaints are not fully supported by the objective medical evidence. Goff v.

46

<u>Barnhart</u>, 421 F.3d 785, 792 (8th Cir. 2005); <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993).  Strict reliance on the absence of objective medical evidence is reversible error.  <u>Halpin</u>, 999 F.2d at 346.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the <u>Polaski</u> standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." <u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

Plaintiff complains here that the ALJ committed reversible error by requiring objective medical evidence to substantiate plaintiff's subjective complaints of pain and,

further, by improperly injecting his own medical opinion regarding the seriousness of plaintiff's pain. A review of the ALJ's written decision, however, belies plaintiff's contentions.

In his decision, the ALJ identified the <u>Polaski</u> factors and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted plaintiff's complaints and treatment to continue through 1998 but that the record thereafter fell silent for a period of years. <u>See</u> <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996) (failure to seek medical treatment for symptoms inconsistent with subjective complaints of pain); <u>see also</u> <u>Spradling v. Chater</u>, 126 F.3d 1072, 1075 (8th Cir. 1997) (failure to seek more aggressive treatment and lack of continuous treatment inconsistent with complaints of disabling pain). The ALJ also noted that, within the relevant time period, plaintiff received steroid injections for her back condition which provided relief and that she took only one prescribed analgesic for mild to moderate pain in addition to over-the-counter medication. <u>See</u> <u>Haynes v. Shalala</u>, 26 F.3d 812, 814 (8th Cir. 1994) (lack of strong pain medication is inconsistent with subjective complaints of disabling pain); <u>Nelson v. Sullivan</u>, 966 F.2d 363, 367 (8th Cir. 1992) (noting use of non-prescription pain medication undercut claimant's complaints of disabling pain); <u>Thomas v. Sullivan</u>, 928 F.2d 255, 259 (8th Cir. 1991) (ALJ may properly consider the type of medication prescribed to determine the sincerity of the claimant's

allegations of pain).  The ALJ also noted that none of plaintiff's treating or examining physicians placed any limitations on plaintiff's activities.  See Hensley v. Barnhart, 352 F.3d 353, 356 (8th Cir. 2003) (subjective complaints of pain not credited where doctors placed few, if any, functional limitations on claimant); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993) (lack of any significant restrictions on claimant's activities by doctors inconsistent with claims of disabling pain).  The ALJ also noted that plaintiff had a poor work record, even pre-dating plaintiff's alleged onset date of disability.  See Ramirez v. Barnhart, 292 F.3d 576, 581-82 n.4 (8th Cir. 2002) (poor work record and financial motivation for benefits may contribute to adverse credibility determination when other factors cast doubt upon claimant's credibility); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996) (low earnings and significant breaks in employment cast doubt on complaints of disabling symptoms); Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (poor work history lessened claimant's credibility).  The ALJ also noted that there were recorded instances in the medical record of plaintiff's exaggeration of symptoms and of inconsistencies between plaintiff's subjective complaints made to her physicians and their observations of plaintiff's actual movements and functional abilities.  See Russell v. Sullivan, 950 F.2d 542 (8th Cir. 1991) (ALJ's credibility determination must be accepted on record which showed inconsistencies between claimant's complaints of pain and actual

observations by treating physicians and therapists, with exaggeration of symptoms noted).  Substantial evidence on the record as a whole supports these findings.

While the ALJ considered the objective medical evidence as a factor in his adverse credibility determination, such consideration was permissible here inasmuch as the ALJ also considered many other inconsistencies in the record in determining plaintiff's subjective complaints not to be fully credible.  See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); Ramirez, 292 F.3d at 581.  Further, a review of the ALJ's decision shows him not to have substituted his own medical opinion for any medical opinion set out in the evidence of record.  Instead, the ALJ thoroughly reviewed all of the evidence  and discussed in detail why plaintiff's subjective complaints of disabling pain were inconsistent and thus not fully credible.  Indeed, the ALJ relied in part on the medical evidence to support his credibility determination.  This was not error.  See Olund v. Chater, 62 F.3d 1421 (8th Cir. 1995) (table).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).

Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. Goff, 421 F.3d at 793; Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

D.    Development of the Record

In cursory fashion, plaintiff contends that the ALJ failed to examine all the evidence of record and should have ordered additional examinations to clarify any purported inconsistencies found by the ALJ to exist. Plaintiff does not specify which evidence of record the ALJ failed to consider or in what manner additional testing may have assisted the ALJ in his determination.

A review of the ALJ's written decision shows him to have thoroughly considered all of the medical evidence of record relating to plaintiff's condition during the relevant time period and to have found plaintiff's condition not to be disabling. To the extent it can be argued that there were inconsistencies in the evidence as to the extent plaintiff experienced limitations on account of her condition, the undersigned notes that where there are conflicts in the evidence, the resolution of such conflicts is for the Commissioner, and not the Court, to make. Beasley v. Califano, 608 F.2d 1162, 1166 (8th Cir. 1979). This is so even when the medical evidence is in conflict. Driggins v. Bowen, 791

F.2d 121, 124 (8th Cir. 1986) (citing <u>Beasley</u>, 608 F.2d at 1166).

To the extent plaintiff claims that the ALJ should have, but failed to, order additional examinations, the undersigned notes that where a claimant's medical sources fail to provide sufficient medical evidence upon which a determination of disability may be made, an ALJ may request the claimant to undergo consultative examinations, which then may be used in determining whether the claimant is disabled. 20 C.F.R. §§ 404.1517, 416.917. In the instant cause, however, the ALJ had before him extensive evidence from multiple physicians and specialists, as well as reports from various diagnostic tests, upon which the ALJ could determine whether plaintiff's impairments rendered her disabled. The need for additional examination, therefore, was unnecessary, and the ALJ did not err in failing to order further testing. 20 C.F.R. §§ 404.1517, 416.917.

E.    <u>Ability to Perform Other Work</u>

        Finally, plaintiff claims that the ALJ's finding that plaintiff can perform other work which exists in significant numbers in the national economy cannot support a finding of non-disability because such work is merely "conceivable and not reasonably possible" on account of limitations caused by her chronic pain. (Pltf.'s Brief at p. 9.)

        At Step 5 of the sequential analysis, the ALJ bears the burden of proving that the claimant has the RFC to perform other kinds of work and that other work exists in substantial numbers in

the national economy that the claimant is able to perform. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines if the claimant's impairments are exertional. In circumstances where non-exertional impairments exist, vocational expert testimony must be obtained to satisfy the burden. Pearsall, 274 F.3d at 1219. In this cause, the ALJ properly found plaintiff's complaints of disabling pain not to be credible and included in the hypothetical posed to the vocational expert only those impairments and limitations he properly found to be supported by substantial evidence. The vocational expert's testimony demonstrated that work exists in significant numbers in the national economy which a person with plaintiff's RFC can perform. Because such testimony was based on a properly framed hypothetical, it constituted substantial evidence upon which the ALJ could base his determination that plaintiff was not disabled. This is all that was required of the ALJ to satisfy his burden at Step 5. "[I]t is not the duty or the burden of the [Commissioner] to find a specific employer and job for the claimant[.]" Barker v. Harris, 650 F.2d 138, 139 (8th Cir. 1981).

## VI. Conclusion

Therefore, for the reasons set out above, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Where

substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

Judgment shall be entered accordingly.

UNITED STATES MAGISTRATE JUDGE

Dated this  *2nd*  day of March, 2009.